UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
KAMILLA S. PECK,

                    Plaintiff,

        -v-                                    5:21-CV-651

COUNTY OF ONONDAGA,
NEW YORK; EUGENE
CONWAY, Onondaga County
Sheriff; JASON CASSALIA,
Undersheriff; KATHERINE
TRASK, Chief; JONATHAN
SEEBER, Sergeant; KELLY
SEEBER, Deputy; SUSAN
DeMARI, Chief Deputy; DAWN
CURRY-CLARRY, Director of
Employee Relations; PAUL
SMITH, Human Resources
Manager; PAULA PELLIZZARI,
Captain; ESTEBAN GONZALEZ,
Chief, JOHN DOE(S), and JANE
DOE(S), all in their individual
and official capacities as
representatives of Onondaga
County and/or the Onondaga
County Sheriff's Office,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

BOSMAN LAW FIRM, LLC                AJ BOSMAN, ESQ.
Attorneys for Plaintiff            ROBERT JAMES STRUM, ESQ.
3000 McConnellsville Road
Blossvale, New York 13308

BOLAÑOS LOWE PLLC                    KYLE W. STURGESS, ESQ.
Attorneys for Defendants
11 Schoen Place, Fifth Floor
Pittsford, New York 14534

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## TABLE OF CONTENTS

I. INTRODUCTION...................................................................................4

II. BACKGROUND................................................................................5

III. LEGAL STANDARD........................................................................16

  A. Motion to Dismiss...........................................................................16

  B. Leave to Amend...............................................................................17

IV. DISCUSSION....................................................................................18

  A. Section 1981.................................................................................... 19

  B. Adequacy of Allegations of Discrimination...................................... 20

    1. Religious Discrimination...............................................................23

    2. Gender Discrimination..................................................................24

    3. Personal Involvement: Section 1983.............................................26

      a.    Conway..............................................................................28

      b.    Cassalia.............................................................................30

      c.    DeMari.............................................................................. 31

      d.    Curry-Clarry......................................................................32

      e.    Smith.................................................................................33

      f.  Pellizzari............................................................................ 34

      g.    Gonzalez............................................................................35

    4. Personal Involvement: NYSHRL..................................................36

  C. Conspiracy..................................................................................... 41

  D. First Amendment Retaliation...........................................................44

  E. Intentional Infliction of Emotional Distress......................................47

  F. Tortious Interference.......................................................................49

  G. Prima Facie Tort............................................................................51

  H. Leave to Amend and Time to Answer..............................................52

V. CONCLUSION...................................................................................52

# I. **INTRODUCTION**

On May 13, 2021, plaintiff Kamilla Peck ("Peck" or "plaintiff") filed this action in Supreme Court, Onondaga County alleging race, gender, and religious discrimination in her workplace, the Onondaga County Sheriff's Office (the "Sheriff's Office").

Peck's state court complaint identified a host of defendants, including Onondaga County itself (the "County"), Sheriff Eugene Conway ("Conway"), undersheriff Jason Cassalia ("Cassalia"), Chief Katherine Trask ("Trask"), Sergeant Jonathan Seeber ("Jonathan"), Deputy Kelly Seeber ("Kelly"), Chief Deputy Susan DeMari ("DeMari"), Director of Employee Relations Dawn Curry-Clarry ("Curry-Clarry"), Human Resources Manager Paul Smith ("Smith"), Captain Paula Pellizzari ("Pellizzari"), Chief Esteban Gonzalez ("Gonzalez"), as well as an unspecified number of John and Jane Doe defendants (the "Does") (collectively "defendants").

On June 3, 2021, defendants removed Peck's complaint to federal court. Thereafter, defendants moved under Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss the complaint in part. Plaintiff opposed and cross-moved to amend her complaint under Rule 15(a)(2).[1] The cross-motions

---

[1] The Court notes that plaintiff is not entitled to amend her complaint as of right because she took more than twenty-one days to cross-move to amend. *See* FED. R. CIV. P. 15(a)(1)(B) (providing that plaintiff may amend pleading as matter of course once within twenty-one days of service of responsive pleading or Rule 12 motion).

have been fully briefed and will be decided on the submissions without oral argument.

## II.  **BACKGROUND**

Peck is a Black woman who has worked in the Sheriff's Office as a Sheriff Deputy-Custody since April 10, 2006.[2]  Dkt. 16-2 ("Compl."), ¶¶ 4, 28. Judging by the complaint, her time working at the Sheriff's Office went smoothly enough to start.  She had no complaints about the workplace until she was transferred from a prior post[3] to the Community Relations Unit.  *Id.* ¶¶ 31, 36.

According to Peck, that new role got off to an inauspicious start. Compl. ¶ 31.  Not long after her transfer to the Community Relations Unit, her supervisor, Sergeant Jonathan Seeber, called her into his office.  *Id.* While she was meeting with him, Jonathan allegedly said to plaintiff "so I have to tell you, the only reason that we brought you in to the unit is because you are Black."  *Id.*

Peck claims that her relationship with Jonathan did not improve much after that rocky beginning.  Instead, she alleges that Jonathan regularly

---

[2] As will be discussed further below, the Court will take the facts of the proposed amended complaint as true in considering the cross-motions for partial dismissal and amendment of the complaint.

[3] The proposed amended complaint is less than clear about what plaintiff's prior role was or when she left it to work at the Community Relations Unit.  However, other allegations in the proposed amended complaint suggest that plaintiff used to be stationed at the jail.  Compl. ¶ 36.

sends her emojis of "Black" hands.  Compl. ¶ 31.  Apparently, he and Chief

Katherine Trask also routinely make fun of plaintiff's "urban dialect," for

example by lampooning her pronunciation of the word "that" as "dat."  *Id.*

Plaintiff claims that they would also often tell her not to "sound like Frank

Fowler," the former Chief of Police for the City of Syracuse, who is a Black

man.  *Id.* ¶ 39.

Apparently, Jonathan's wife, defendant Deputy Kelly Seeber, has joined in

with racially charged slights of her own.  Compl. ¶ 32.  According to plaintiff,

Kelly changed the contact icon for plaintiff on her phone to a picture of Black

actress Octavia Spencer dressed as a maid for the film *The Help*.  *Id.*  When

plaintiff found out, she became upset and asked that the picture be

changed.  *Id.*  Kelly refused, and instead showed the icon to Trask and said

"doesn't this look like [plaintiff]?"  *Id.*  Trask allegedly replied that it did.  *Id.*

Trask's purportedly flippant response only made Peck more upset, and she

told Kelly and Trask as much.  Compl. ¶ 32.  Apparently, Jonathan only

laughed and told plaintiff to "relax," "get a thick skin," and to "stop taking

things so personal[ly]."  *Id.*  Plaintiff describes these and similar "racially

disparaging comments" as "regular and continuous" in the Sheriff's

Office.  *Id.*

According to Peck, she applied for a promotion to the rank of Sergeant in

2017.  Compl. ¶ 34.  She was ultimately denied.  *Id.*  Plaintiff alleges that the

candidates chosen in her stead were White male officers who had the same Civil Service test score that plaintiff had. *Id.* She also alleges that she had seniority over both. *Id.*

On August 7, 2019, Peck tripped backwards over a sandbag placed in front of the Sheriff's Office. Compl. ¶ 32. Plaintiff's accident was caught on video, which plaintiff claims Jonathan has admitted to showing to several officers around the office. *Id.* Apparently, the video became the subject of ridicule and claims by her other coworkers that plaintiff was faking her injuries. *Id.* Plaintiff applied for disability benefits under New York General Municipal Law § 207-c, which were approved in October of 2019. *See Id.* ¶ 33.

In November of 2019, Peck tried her hand at a promotion to Sergeant for a second time. Compl. ¶ 34. She interviewed for that position on November 4 of that year. *Id.* However, she claims that she was denied promotion once again. *Id.* This time, a Hispanic man and a White woman got the promotion plaintiff was after. *Id.* But plaintiff alleges that she had both seniority and higher Civil Service test scores than both new Sergeants. *Id.* According to plaintiff, defendant Chief Esteban Gonzalez made these promotion decisions, or else recommended these individuals to defendant Sheriff Eugene Conway to make the final call. *Id.*

Around December of 2019, defendant Chief Deputy Susan DeMari was appointed to the benefits committee at the Sheriff's Office. Compl. ¶ 33.

7

Apparently, DeMari's arrival on the committee was an ill omen for Peck, because she received a letter dated February 18, 2020 denying her benefits from her August 7, 2019 accident.[4]  *Id.*  Plaintiff appealed this denial, but apparently the committee ignored her appeal.  *Id.*  Plaintiff claims that, "upon information and belief," similar on-duty injuries suffered by White or male co-workers did not face the same obstacles.  *Id.*

In the background of these alleged denials, Peck's working relationship with Jonathan continued to lead to conflict.  Plaintiff alleges that she "has been and continues to be held to greater scrutiny and higher standards of performance and restrictions than her White counterparts."  Compl. ¶ 36. She claims that this scrutiny intensified once she started complaining about discrimination.  *Id.*

Jonathan seems to be a particular source of scrutiny concerning Peck's work.  *See* Compl. ¶ 36.  According to plaintiff, he repeatedly threatens to send her back to her previous post working at the jail.  *Id.*  For example, on January 29, 2020, Jonathan sent plaintiff a text message ordering her to call him immediately or he would "have her 'transfer papers set for the jail[.]'"  *Id.*

---

[4]  The complaint is a model of murkiness on what, precisely, this "denial" meant.  Plaintiff alleges that her benefits were approved in October 2019.  Compl. ¶ 33.  Whether she had been granted benefits in October of 2019 but they were not renewed in February of 2020 or whether they were retroactively withdrawn is left to the imagination.  *See id.*

Judging by the proposed amended complaint, June seemed to be the tipping point for Peck's work environment at the Sheriff's Office.  On June 1, 2020, plaintiff and Jonathan discussed the death of George Floyd.  Compl. ¶ 35.  During that conversation, Jonathan apparently denied that George Floyd's death was caused by racial discrimination but instead was "just a 'death in custody' and that [plaintiff] had been 'brainwashed'" for believing otherwise.  *Id.*

On June 11, 2020, Peck complained about "the discriminatory and hostile work environment" to Jonathan and Trask.  Compl. ¶ 38.  In response, she alleges that they chose a "car seat re-certification instructor" who had a "well-known dislike for [p]laintiff."  *Id.*  A White coworker apparently was not burdened with a similar difficulty.  *Id.*  Plaintiff notes that she "was not provided or offered any written complaint form to file formally at that time."  *Id.*

Then, on June 15, 2020, Jonathan and Trask "ganged up on" Peck to ask her "why her computer was not on and what time she arrived."  Compl. ¶ 38.  Trask then demanded in front of plaintiff's coworkers that Jonathan write plaintiff up for "not producing a feedback email."  *Id.*  The next day, Peck alleges that she and her union representative attended a mediation with Jonathan and Trask.  *Id.* ¶ 39.  At the mediation, plaintiff raised the "discriminatory and retaliatory" conduct described above.  *Id.*

9

On June 18, 2020, defendants Conway and undersheriff Jason Cassalia attended a forum on race at Onondaga Community College.  Compl. ¶ 40. Peck was also there, and she used the opportunity to report Jonathan, Kelly, and Trask's behavior to the ranking members of the Sheriff's Office.  *Id.* Conway and Cassalia reassured plaintiff not to worry.  *Id.*  That same day, DeMari gave plaintiff "an unsolicited complaint form."  *Id.* ¶ 41.

On June 22, 2020, Peck came to work with the completed complaint form.  Compl. ¶ 41.  But when she got to her desk, she realized that it "had clearly been rifled and gone through as items on her desk were missing and/or disheveled."  *Id.*  Plaintiff immediately went "in a panic" to defendant Dawn Curry-Clarry, the Director of Personal Relations.  *Id.*  Plaintiff told Curry-Clarry that plaintiff feared that she was in danger because of her ransacked desk.  *Id.*  That same day, Curry-Clarry, "in consultation with" Conway, placed plaintiff on administrative leave until July 27, 2020.  *Id.*

On June 23, 2020, DeMari apparently called Peck and "demanded" that plaintiff return the keys to her marked police car so other officers could use it while she was out.  Compl. ¶ 42.  But according to plaintiff, the Sheriff's Office has multiple sets of keys for each vehicle, so there was no need to force plaintiff to give up her set.  *Id.*  The vehicle was never returned to plaintiff, which allegedly was DeMari's intent from the beginning.  *Id.*  Plaintiff

brought this deprivation to Cassalia's attention, but he disregarded it as "not retaliatory." *Id.*

At some unspecified point, DeMari allegedly "retaliated and discriminated against [Peck] by commencing an internal affairs investigation" that accused plaintiff of leaving work "eight minutes early."  Compl. ¶ 43.  According to plaintiff, the claim was "spurious" and "instigated in bad faith."  *Id.*

During Peck's administrative leave, defendant Curry-Clarry and an investigator called plaintiff and her husband into the Sheriff's Office to discuss the results of the investigation into plaintiff's ransacked desk.  Compl. ¶ 44.  According to plaintiff, the investigation was "inaccurate and incomplete," leading up to Curry-Clarry's "retaliatory" finding that the complaint was unfounded.  *Id.*  Plaintiff further claims that Curry-Clarry threw in an accusation that plaintiff had acted unprofessionally for good measure.  *Id.*  In doing so, plaintiff claims that she credited Jonathan, Kelly, and Trask's word over plaintiff's and that of her independent witness.  *Id.*

There was one consequence of the investigation, though.  Apparently, Peck was assigned a new supervisor: defendant Captain Paula Pellizzari.  Compl. ¶ 44.  But this measure was largely ceremonial to plaintiff's mind.  *Id.*  After all, Pellizzari did not understand how the Community Relations Division worked, so plaintiff claims she relied on Seeber and Trask to help her determine plaintiff's assignments.  *Id.*

11

What is more, Peck claims that those assignments were themselves particularly degrading.  Compl. ¶ 45.  Plaintiff alleges that she was forced to "count every single community relations item" in the office and basement, a task never given to White officers in her position.  *Id.*  Plaintiff also alleges that Pellizzari moved her office at some point.  *Id.*

Apparently fed up, Peck filed a discrimination and retaliation complaint with the New York State Division of Human Rights and the United States Equal Employment Opportunity Commission ("EEOC") on June 30, 2020.  Compl. ¶ 19.  According to plaintiff, every defendant knew about the EEOC complaint.  *Id.* ¶ 47.

Peck nevertheless continued to work under these conditions until September of 2020.  Compl. ¶ 48.  That month brought two changes.  First, plaintiff filed a second EEOC complaint for discrimination and retaliation on September 1, 2020.  *Id.* ¶ 20.  Second, plaintiff's physicians allegedly took her out of work due to her August 7, 2019 injury.  *Id.* ¶ 48.  She would not return to work until early November of 2020.  *Id.*  Once she got back, she apparently discovered that "most of her job duties [had been] eliminated and she was relegated to perform[ing] menial tasks."  *Id.*

Peck's return to work would prove to be short-lived.  In mid-November of 2020, she again needed to leave work, and she provided the Sheriff's Office with medical excuses to that effect.  Compl. ¶ 49.  Defendants apparently did

not initially respond.  *See id.*  But on January 28, 2021, defendant Paul

Smith, who works under DeMari, sent plaintiff a letter telling her that she

had failed to submit an "Appendix C" to her leave request, as required by the

Collective Bargaining Agreement ("CBA").  *Id.* ¶ 50.

The letter apparently threatened that "all of [Peck's] absences will be

chargeable offenses under Article 35 of [the CBA]" and that discipline could

follow, "up to and including termination."  Compl. ¶ 50.  According to

plaintiff, and despite the terms of the CBA, defendants do not require injured

officers or their healthcare providers to actually submit Appendix C.  *Id.* ¶ 51.

Peck has not returned to work since November 17, 2020.[5]  Compl. ¶ 55.

Defendants have nevertheless denied plaintiff's benefits and worker's

compensation applications based on her injury.  *Id.*  Plaintiff claims that

White or male employees of the Sheriff's Office did not suffer through the

same difficulties.  *Id.*  For example, a female sergeant allegedly suffered a

similar injury at work that took her out of the office for "three to four

months."  *Id.*  According to plaintiff, this other sergeant was granted benefits

without challenge, and returned to work with a light duty accommodation.

*Id.*  Plaintiff claims that Jonathan and Trask had a hand in this denial,

alleging that they have insinuated that plaintiff's injuries are exaggerated or

---

[5]  There is no indication that she has been fired or quit, either.

faked by supplying videos purporting to show that plaintiff was not truly injured.  *Id.*

On February 5, 2021, Peck asked the EEOC for a Right to Sue letter.  Compl. ¶ 52.  Defendants were apparently aware that plaintiff made this request.  *Id.*  On February 11, 2021, less than a week later, DeMari sent Civil Deputies to plaintiff's home twice to serve her with personnel paperwork.  *Id.* ¶ 53.  According to plaintiff, this paperwork could just as easily have been sent by mail, electronic or otherwise.  *Id.*  Instead, DeMari allegedly sent the deputies to "retaliate against [p]laintiff and discourage her from pursuing legal recourse for her discrimination and retaliation claims" by having the deputies "bang" on plaintiff's door, scaring her children.  *Id.*

On March 2, 2021, Pellizzari "threatened [Peck] with a suspension without pay and ordered [her] to surrender her duty equipment," apparently with Conway's authorization.  Compl. ¶ 54.  Plaintiff would later learn that DeMari wanted to suspend plaintiff for three days for failing to provide Appendix C in her request for medical leave.  *Id.*  DeMari allegedly wanted plaintiff to sign the disciplinary charge in person and to surrender her equipment.  *Id.*  According to plaintiff, this is contrary to the Sheriff's Office's policy that members absent for an injury are not asked to surrender their equipment.  *Id.*

On May 6, 2021, the EEOC gave Peck a right to sue letter for her September 1, 2020 complaint.  Compl. ¶ 22.  On May 19, 2021, plaintiff received a similar letter covering the facts alleged in her June 30, 2020 complaint.  *Id.*  Plaintiff acted on those rights on May 13, 2021—apparently before receiving the second right to sue letter—by filing a complaint in New York State Supreme Court, Onondaga County.  Dkt. 1-1, p. 32.[6]  The complaint stated twenty causes of action.  *See id.*, pp. 19-31.

On June 3, 2021, defendants removed Peck's complaint to this Court.  Dkt. 1.  On June 9, 2021, defendants moved to dismiss the complaint in part and for a stay in their time to answer the portions of the complaint they did not move to dismiss.  Dkt. 9.  On July 7, 2021, plaintiff cross-moved to amend her complaint.  Dkt. 16.  That cross-motion appears to have conceded to dismissal of five counts of the original complaint, leaving only fifteen counts remaining.  *See id.* at 19-31.

Those fifteen counts are: (I) discrimination based on race and gender in violation of Title VII of the Civil Rights Act of 1963 ("Title VII") against the County; (II) race and gender discrimination under the New York State Human Rights Law ("NYSHRL") against the County; (III) NYSHRL race and gender discrimination against the individual defendants; (IV) race

---

[6] Pagination Corresponds with CM/ECF.

discrimination against all defendants under 42 U.S.C. § 1981 ("§ 1981");

(V) race and gender discrimination in violation of the Equal Protection

Clause of the Fourteenth Amendment against all defendants under

42 U.S.C. § 1983 ("§ 1983"); (VI) conspiracy to discriminate based on race and

gender in violation of § 1983 against all defendants; (VII) Title VII retaliation

against the County; (VIII) NYSHRL retaliation against the County;

(IX) NYSHRL retaliation against the individual defendants; (X) retaliation

against all defendants under § 1981; (XI) retaliation in violation of the First

Amendment against all defendants under § 1983; (XII) retaliation in violation

of the Fourteenth Amendment against all defendants under § 1983;

(XIII) intentional infliction of emotional distress against Trask, Jonathan,

Kelly, DeMari, Curry-Clarry, Smith, Pellizzari, and Does; (XIV) tortious

interference with her contractual rights to be free from discrimination under

the CBA against Trask, Jonathan, Kelly, DeMari, Curry-Clarry, Smith,

Pellizzari, Gonzalez, and Does; and (XV) *prima facie* tort against Trask,

Jonathan, Kelly, DeMari, Curry-Clarry, Smith, Pellizzari, Gonzalez, and

Does.

## III.  <u>LEGAL STANDARD</u>

### A. <u>Motion to Dismiss</u>

To survive a motion to dismiss, "a complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on

its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  That factual matter may be drawn from "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

Importantly, "the complaint is to be construed liberally, and all reasonable inferences must be drawn in the plaintiff's favor." *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  If the complaint and its additional materials—when viewed through that pro-plaintiff lens—are not enough to raise the plaintiff's right to relief on a claim above the speculative level, that claim must be dismissed.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## B. **Leave to Amend**

Under Rule 15, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2).  However, justice does *not* require a party to be given leave to amend if amendment would be futile.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

When "a plaintiff seeks to amend the complaint while a motion to dismiss is pending," a court's options to deal with the motion to dismiss range "from

17

denying the motion as moot to considering the merits of the motion in light of the amended complaint." *Donato v. Serv. Experts, LLC*, 2018 WL 4660375, at *2 (N.D.N.Y. Sept. 28, 2018).  If a proposed amendment would not fix a defect identified in a motion to dismiss, permitting amendment would of course be futile.  *See IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) ("The standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss.").

## IV. <u>DISCUSSION</u>

Defendants initially attacked Peck's complaint from six different directions.  However, two of those arguments were mooted when plaintiff abandoned five counts of her original complaint in her proposed amended complaint.

This leaves the Court with four remaining arguments to consider.  First, defendants argue that plaintiff has failed to adequately plead personal involvement for several defendants as required for her discrimination claims.  Second, defendants argue that plaintiff's conspiracy claims are inadequately pled, especially in light of the intracorporate conspiracy doctrine.  Third, defendants argue that plaintiff has failed to state a First Amendment retaliation claim.  And fourth, defendants argue that plaintiff's New York

common law torts each fail for a different reason.  Each argument will be
tackled in turn.

**A. <u>Section 1981</u>**

But before getting into defendants' arguments, the Court notes that both
parties missed a fundamental flaw in Peck's § 1981 claims.  Namely, the
Second Circuit has held that "§ 1981 does not provide a . . . private right of
action against state actors." *Duplan v. City of N.Y.*, 888 F.3d 612, 621
(2d Cir. 2018).  Instead, "the express cause of action for damages created by
§ 1983 constitutes the exclusive federal remedy for violation of the rights
guaranteed in § 1981 by state governmental units . . . ." *Jett v. Dallas Indep.
Sch. Dist.*, 491 U.S. 701, 733 (1989).

Municipalities and municipal employees are state actors.  *See, e.g.*, *Whaley
v. City Univ. of N.Y.*, 555 F. Supp. 2d 381, 400-01 (S.D.N.Y. 2008).  As a
consequence, courts in the Second Circuit have dismissed § 1981 claims
against municipalities and their employees—even when the employees are
sued in their individual capacities.  *Duplan*, 888 F.3d at 616, 621 (dismissing
§ 1981 retaliation claim against City of New York because § 1983 was sole
remedy); *Gonzalez v. City of N.Y.*, 377 F. Supp. 3d 273, 284-85
(S.D.N.Y. 2019) (dismissing claims against individual defendants sued in
individual capacities as municipal employees under *Duplan*'s reasoning).

Peck's coworkers are all municipal employees, and are therefore state actors.  Compl. ¶¶ 7-16.  By extension, § 1983 is the sole federal remedy for a discrimination claim against defendants.  *Duplan*, 888 F.3d at 621.  Counts IV and X of the proposed amended complaint must therefore be dismissed in their entirety and against all defendants.  *See, e.g.*, *Gonzalez*, 377 F. Supp. 3d at 284-85; *see also J.S. v. T'Kach*, 714 F.3d 99, 103-05 (2d Cir. 2013) (affirming district court's *sua sponte* dismissal of claim where unsustainable on face of complaint).

## B. Adequacy of Allegations of Discrimination

"A plaintiff who claims . . . discrimination in public employment in violation of the Fourteenth Amendment may bring suit [under] § 1983."  *Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019).

A § 1983 claim has two global elements: (1) that the plaintiff suffered a deprivation of a right secured by the Constitution and laws of the United States; and (2) that deprivation was at the hands of a person acting under color of state law.  *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004).

The Equal Protection clause of the Fourteenth Amendment prohibits disparate treatment by a public employer on the basis of race, gender, or religion.  *See, e.g.*, *Greene v. Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 145 (E.D.N.Y. 2013) (considering § 1983 claim sounding in equal protection based on race, gender, and religion).

Title VII and the NYSHRL provide alternate bases of liability for
employers who engage in discrimination based on race, gender, or
religion. *See, e.g.*, *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 149 n.15
(2d Cir. 2018) (Lynch, J., dissenting) (noting that claims for gender, race, and
religion under Title VII are analyzed identically); *Bermudez v. City of N.Y.*,
783 F. Supp. 2d 560, 586 (S.D.N.Y. 2011) (same for NYSHRL).

Although there are certainly differences between § 1983, Title VII, and the
NYSHRL, *Naumovski*, 934 F.3d at 212, the same elements apply to each, at
least at the pleading stage, *see Guity v. Uniondale Union Free Sch. Dist.*,
2017 WL 9485647, at *13 (E.D.N.Y. Feb. 23, 2017).

To that end, discrimination claims under Title VII, § 1983, or the
NYSHRL come in at least three varieties: (1) disparate treatment; (2) hostile
work environment; and (3) retaliation. *See Demoret v. Zegarelli*, 451 F.3d
140, 144 (2d Cir. 2006), (listing types of discrimination claimed by plaintiff
under all three statutes) *overruled on other grounds by Burlington N. &
Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

For a disparate treatment claim, that standard requires a plaintiff to
plead: (1) "that she is a member of a protected class"; (2) that she was
qualified for her position or the position she pursued; (3) "that she suffered an
adverse employment action"; and (4) that she "can sustain a minimal burden
of showing facts suggesting an inference of discriminatory

motivation[.]" *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). That burden is "reduced" at the motion to dismiss stage. *See id.*

But light burden or no, the plaintiff must still allege facts "supporting a facially plausible inference that the defendants' actions were motivated by discriminatory animus." *Bidot v. Cty. of Suffolk*, 2020 WL 6385072, at *6 (E.D.N.Y. Aug. 20, 2020) (cleaned up). "[B]ald assertions of discrimination . . ., unsupported by any comments, actions, or examples of similarly-situated individuals outside of [the plaintiff's] protected class being treated differently" to allow an inference of discriminatory motive "are implausible and insufficient to survive a motion to dismiss." *Jackson v. Cty. of Rockland*, 450 F. App'x 15, 19 (2d Cir. 2011) (summary order) (citing *Iqbal*, 556 U.S. at 680-81 (dismissing complaint alleging malicious infliction of harsh conditions of confinement because of "religion, race, and/or national origin" without factual allegations to back claim up)).

Alternatively, a plaintiff can plead a hostile work environment if she can show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21. The conduct complained of must be: (1) objectively severe enough that a reasonable person would find it "hostile or abusive"; and (2) subjectively perceived as abusive by the

victim. *Id.* at 321.  Episodic incidents are not enough; the misconduct must be "continuous," "concerted," or "pervasive." *Id.*

Finally, to plausibly allege retaliation, a plaintiff need only allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 316.  Once again, though, the plaintiff's burden at the Rule 12(b)(6) stage is "reduced." *Id.*

## 1. **Religious Discrimination**

Before addressing the individual defendants' personal involvement, the Court notes that Peck has failed to plausibly allege discrimination on the basis of religion.[7]  Her complaint's sole factual reference to discrimination of that sort consists of a single sentence: "Upon information and belief, one or more [d]efendants also mocked and disparaged [p]laintiff's religious belief[s] and/or practices to each other and/or" her coworkers.  Compl. ¶ 46.

That one allegation, void of any details as to context or even content cannot be enough to sustain a claim of religious discrimination.  The Court cannot find that Peck has plausibly tied any adverse actions in her complaint

---

[7] It is unclear to what extent plaintiff even alleges a religious discrimination claim.  The counts of her proposed amended complaint sounding in discrimination make no mention of religion, but her complaint as a whole makes several references to religious discrimination.  *Compare* Dkt. 16-2, pp. 19-31 (counts of proposed amended complaint making no allegations of religious discrimination), *with* Compl. ¶¶ 25, 37, 46 (alleging defendants' discriminating against plaintiff on basis of religion).

to religious discrimination when the proposed amended complaint gives no suggestion as to when any discriminatory comment would have been made, or by whom.  To whatever extent plaintiff's Title VII, § 1983, and NYSHRL claims rely on religious discrimination, those claims must be dismissed.  *See, e.g.*, *Gaddy v. Waterfront Comm'n*, 2014 WL 4739890, at \*5-6 (S.D.N.Y. Sept. 19, 2014) (dismissing § 1983 claim as "devoid of factual allegations to support a plausible inference of intentional discrimination").

### 2. Gender Discrimination

Peck's allegations of gender discrimination are stronger, but not enough.  The sum total of the specific allegations of gender discrimination in the complaint are: (1) plaintiff claims "[u]pon information and belief" that male co-workers were not denied injury benefits (although plaintiff's lone comparator to support this allegation is a female); and (2) plaintiff claims that she was passed over for promotion to sergeant twice, although one of the officers promoted was a female.  Compl. ¶¶ 33-34, 35, *but see id.* ¶ 55 (identifying as comparator for benefits White female Sergeant Jane DeMarco).

Courts routinely reject complaints relying on comparisons this threadbare.  *See Williams v. N.Y.C. Health & Hosp. Corp.*, 2010 WL 2836356, at \*4 (E.D.N.Y. July 16, 2010) (dismissing Title VII claim where plaintiff only alleged that "[u]pon information and belief, males got paid when they were

out sick but females [did] not" but failed to specify any facts to support

claim).  This Court sees no reason to set itself apart on that score.

These two threadbare comparisons aside, Peck only offers vague and

conclusory allegations; for example plaintiff alleges that she was "subjected to

conduct designed to degrade and demean her on the basis of her race, gender,

religion, and/or protected activity."  Compl. ¶ 37.  These allegations are not

enough to save her claims of gender discrimination, either.  *See, e.g.*, *Kunik v.*

*N.Y.C. Dep't of Educ.*, 436 F. Supp. 3d 684, 696-97 (S.D.N.Y. 2020)

(dismissing discrimination claim because "[p]laintiff fails to identify any

evidence of [discriminatory] remarks . . . negative comments about others in

her protected classes, or any evidence to show discriminatory intent or

disparate treatment" where only allegations of discrimination were

conclusory).

In short, Peck has failed to plausibly allege that she was discriminated

against on the basis of gender.  To whatever extent her Title VII, § 1983, and

NYSHRL claims depend on gender discrimination, those claims must also be

dismissed.  *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 499

(E.D.N.Y. 2019) (adopting report and recommendation dismissing disparate

treatment claim where only allegation to support discriminatory animus was

allegation that non-Black coworkers were given favorable treatment

compared to Black plaintiff because comparators were not alleged with sufficient specificity).

### 3. **Personal Involvement: Section 1983**

However, as a brief review of the factual recitation above should make clear, Peck's allegations of racial discrimination are more substantial and cannot be so easily resolved. Accordingly, the Court will at last consider defendants' arguments in favor of dismissal.

Unlike Title VII, which can only be brought against an employer, a § 1983 discrimination claim can be brought against "any individual responsible for the discrimination." *Naumovski*, 934 F.3d at 212 (cleaned up). However, a plaintiff must prove that the individual she pursues under § 1983 was personally involved in her alleged constitutional violation. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006).

"A defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016). Traditionally, a plaintiff advancing a claim of § 1983 discrimination in the Second Circuit would have to prove a defendant's personal involvement by providing evidence that: (1) the defendant was a direct participant in the alleged violation; (2) the defendant failed to correct the violation after learning about it through a report or appeal; (3) the defendant created or allowed to continue

a policy or custom under which the violation occurred; (4) the defendant was grossly negligent in supervising subordinates who committed the violation; or (5) the defendant exhibited deliberate indifference by not acting on information suggesting that the violations were occurring. *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

But the continued viability of that test for personal involvement found itself on thin ice after *Iqbal*. 556 U.S. 662. That case may be best known for undergirding the now-familiar plausibility pleading standard that governs pleadings and motions to dismiss those pleadings. *Id.* at 678-79. However, it also held that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Id.* at 676. Whether any but the first of the five paths to personal involvement previously allowed in the Second Circuit remained open after that holding was anyone's guess for several years afterwards.

But the Second Circuit answered the uncertainty last year in *Tangreti v. Bachmann*. 983 F.3d 609, 618 (2d Cir. 2020). The answer was a simple one: "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* (internal citations and quotation marks omitted). That is to say, "[t]he violation must be established against the supervisory official directly." *Id.*

Defendants argue that Peck has failed to adequately allege personal involvement for seven of her party opponents: (1) Conway; (2) Cassalia; (3) DeMari; (4) Curry-Clarry; (5) Smith; (6) Pellizzari; and (7) Gonzalez.  The Court will consider the allegations against each defendant in turn.

### a. **Conway**

Peck's proposed amended complaint lays four allegedly discriminatory acts at Conway's feet: (1) Conway's potentially making the final decision on Sergeant promotions on Gonzalez's recommendation; (2) not remedying plaintiff's discriminatory work environment after she brought it to his attention on June 18, 2020; (3) consulting with Curry-Clarry before she put plaintiff on administrative leave after plaintiff complained about her desk being searched; and (4) authorizing Pellizzari to threaten plaintiff with suspension without pay and ordering her to surrender her duty equipment on March 2, 2021.  Compl. ¶¶ 34, 40-41, 54.

From the jump, Peck's allegation that Conway failed to remedy the discriminatory conduct against her at the Sheriff's Office after June 18, 2020 essentially argues that he was deliberately indifferent to an ongoing violation.  Compl. ¶ 40; *see Grullon*, 720 F.3d at 139 (attaching personal involvement for deliberate indifference to information suggesting violation is occurring).  Yet *Tangreti* demands more.  983 F.3d at 618.  Plaintiff must

28

allege that Conway actively participated in a constitutional violation, and this allegation does not further that end.  *See id.*

However, from the deferential vantage point of a motion to dismiss, the remaining allegations against Conway sufficiently support personal involvement in constitutional violations for Peck's claims to survive.  Reading all inferences in plaintiff's favor, the Court must assume that Conway took Gonzalez's recommendations as to who should be promoted to Sergeant and chose three White people and one Hispanic person for promotion despite plaintiff's superior credentials.  *Ginsburg*, 839 F. Supp. 2d at 540 (requiring district courts to make all permissible inferences in plaintiff's favor on Rule 12(b)(6) motions).  Plaintiff's superior credentials then allow for the "minimal" inference of discriminatory animus required to sustain a discrimination claim.  *Littlejohn*, 795 F.3d 297, 311.

Peck's remaining two allegations of discrimination by Conway are an even closer call, but the Court still must let them pass through defendants' motion.  True, whether "consulting" with one of plaintiff's supervisors and "authorizing" another to engage in allegedly discriminatory conduct stretches *Tangreti*'s exacting personal involvement requirements thin.  983 F.3d at 618.  Also true, there is next to nothing in the complaint tying either plaintiff's administrative leave or threatened suspension to plaintiff's race.

While that latter point may spell trouble for the last two allegations as a straightforward disparate treatment claim, they nevertheless adequately support a claim for retaliation.

Peck has alleged that Conway was aware of her complaints concerning discrimination by other Sheriff's Office employees.  Compl. ¶ 52.  Plaintiff was also put on administrative leave shortly after submitting a complaint alleging discrimination, allowing for a plausible inference of retaliatory intent.  *Id.* ¶ 41.  The same permissible inference arises from Conway's allegedly authorizing plaintiff to be threatened with a suspension less than a month after she requested an EEOC right to sue letter.  *Id.* ¶¶ 52, 54.

In short, Peck has alleged that Conway was aware of multiple complaints of discrimination brought by plaintiff, each of which was closely followed by an adverse action in which he had a hand.  Accordingly, plaintiff's § 1983 disparate treatment and retaliation claims against Conway must survive.

### b. **Cassalia**

Peck only alleges two acts by Cassalia: (1) not remedying the discriminatory practices she pointed out at the June 18, 2020 open forum; and (2) him dismissing her complaints concerning having her vehicle taken away on June 23, 2020.  Compl. ¶¶ 40, 42.

Both allegations amount only to inaction, while disparate treatment and retaliation claims require plaintiff to allege—and eventually prove—an

adverse action.  *Littlejohn*, 795 F.3d at 311, 316.  And a hostile work environment claim requires plaintiff to prove Cassalia's participation in an extreme and ongoing abusive environment.  *Id.* at 320-21.

Neither allegation Peck has brought forward against Cassalia amounts to an adverse action.  *Lee v. Healthfirst, Inc.*, 2007 WL 634445, at *14 (S.D.N.Y. Mar. 1, 2007) (holding that "inactions by management are not adverse actions" for employment discrimination).  Similarly, neither amounts to Cassalia's participation in any hostile work environment.  Accordingly, neither allegation survives *Tangreti*.  983 F.3d at 618 (requiring defendant to personally contribute to constitutional violation for § 1983 liability to attach).  Plaintiff's § 1983 claims for both discrimination and retaliation under Counts V and XII against Cassalia must be dismissed.

### c. **DeMari**

Peck's allegations against DeMari are slightly more substantial.  There are five in all: (1) the denial of plaintiff's disability benefits on February 18, 2020; (2) DeMari's demand that plaintiff return the keys to her police vehicle; (3) De Mari's alleged instigation of an internal affairs investigation over plaintiff's leaving work early; (4) sending Civil Deputies to plaintiff's home to deliver personnel paperwork that could have been sent by other means; and (5) attempting to suspend plaintiff for three days for not completing Appendix C of her leave request.  Compl. ¶¶ 33, 42-43, 53-54.

Those five allegations establish DeMari's personal involvement in alleged discrimination and retaliation.  As for the first point, Peck has alleged that a white female sergeant suffered a similar accident shortly before plaintiff's injury and was approved for the same benefits.  That meets plaintiff's reduced burden for allowing a disparate treatment claim to survive a Rule 12(b)(6) motion.  *Littlejohn*, 795 F.3d at 311.

The remainder of the allegations all closely followed protected speech by Peck and allow for a permissible inference of retaliation.  Compl. ¶¶ 42-43, 53-54 (DeMari demanding return of keys and initiating investigation within days of written discrimination complaint, sending officers to plaintiff's home less than week after plaintiff requested right to sue letter, and threatening suspension without pay less than one month after plaintiff requested right to sue letter).  Plaintiff's claims against DeMari must survive defendants' Rule 12(b)(6) motion.

### d. **Curry-Clarry**

Against Curry-Clarry, Peck's allegations amount to: (1) an insufficient and inaccurate investigation into plaintiff's claim that Jonathan, Kelly, and Trask rifled through plaintiff's desk; and (2) a general failure to ameliorate the discriminatory atmosphere of which plaintiff complained.  Compl. ¶¶ 44, 47-52.  For the same reasons that proved fatal to plaintiff's allegations against Cassalia, Curry-Clarry's mere inaction in resolving plaintiff's

complaint does not meet the requisite level of personal involvement for § 1983 liability to attach. *Tangreti*, 983 F.3d at 618.

However, the Second Circuit has made plain that a failure to investigate a claim can be retaliatory if it is "in retaliation for some separate, protected act by the plaintiff." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 722 (2d Cir. 2010). Peck has alleged that, in retaliation for her earlier complaints of discrimination, Curry-Clarry gave short shrift to plaintiff's claims that her desk had been rifled through by Jonathan and Trask. Compl. ¶ 44. That is enough to state personal involvement in a claim of retaliation, and plaintiff's § 1983 claim must survive as to Curry-Clarry.

### e. **Smith**

Next, defendants take issue with Peck's allegations of personal involvement for Smith. The only allegations against Smith are that he knew that plaintiff had complained to the EEOC and had threatened her with discipline. Compl. ¶¶ 47, 50. But plaintiff has also alleged that the threat was for failing to submit "Appendix C" with her leave request when no other officer has been required to submit that form. *Id.* ¶¶ 50-51.

Once again, the deferential standard on a motion to dismiss compels the Court to take that allegation as true. *Ginsburg*, 839 F. Supp. 2d at 540. Viewed as true, it is plausible that Peck was singled out by Smith and threatened with discipline on overblown charges because she spoke out

33

concerning discrimination.  That allegation is enough to support personal involvement in § 1983 retaliation by Smith.  Plaintiff's claim of retaliation against Smith must survive.

### f.  **Pellizzari**

Defendants also object to the proposed amended complaint's relative lack of allegations against Pellizzari.  Peck accuses Pellizzari of: (1) not stopping Jonathan and Trask from discriminating against plaintiff; (2) moving plaintiff's office; (3) assigning plaintiff menial tasks; and (4) threatening plaintiff with suspension for failing to submit an "Appendix C" with her leave request.  Compl. ¶¶ 44-45, 54.

Once again, not stopping discrimination is not enough—plaintiff must allege that Pellizzari was an active participant.  *Tangreti*, 983 F.3d at 618.  Plaintiff's first claimed act of discrimination by Pellizzari thus fails.  *See, e.g.*, *id.*  The remainder of the allegations nevertheless plausibly establish personal involvement in retaliation claims, notwithstanding defendants' arguments to the contrary.

Whether moving an employee's office is an adverse action under the retaliation rubric may become an issue at summary judgment, but plaintiff has nevertheless alleged enough to withstand defendants' Rule 12 motion.  *See, e.g.*, *Jordan v. Cayuga Cty.*, 2004 WL 437459, at *6 (N.D.N.Y. Feb. 9, 2004) (considering on summary judgment whether moving

office without further allegations of adverse change in employment conditions constituted adverse action for retaliation).  The same is true of whether plaintiff's assigned tasks were sufficiently adverse.  *See, e.g.*, *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 214 (E.D.N.Y. 2014) (considering whether assignment of menial tasks was adverse on summary judgment).

And of course, the logic that compelled the Court to allow Peck's claims concerning the threatened suspension to move forward against Conway apply with equal force here.  In other words, plaintiff has adequately alleged three potentially adverse actions against Pellizzari.  Those claims must survive.

### g. Gonzalez

Peck's claims of discrimination against Gonzalez stem entirely from his decision not to either select or recommend plaintiff for promotion to Sergeant.  Compl. ¶ 34.  Those claims survive for precisely the same reasons they survived against Conway above.

The Court notes, however, that both promotion decisions predated any of Peck's protected activities.  *Compare* Compl. ¶ 34 (Gonzalez denying plaintiff promotion for second time in November 2019), *with id.* ¶ 38 (complaining for first time to Jonathan and Trask on June 11, 2020).  Of course, plaintiff cannot prove that her protected speech caused a hiring decision that predated it by six months.  *See, e.g.*, *Adams v. City of N.Y.*, 837 F. Supp. 2d 108, 123 (E.D.N.Y. 2011) (holding that adverse actions occurring prior to any protected

activity "cannot be retaliatory as a matter of law and logic."). Plaintiff's retaliation claims against Gonzalez under Count XII must be dismissed.

### 4. **Personal Involvement: NYSHRL**

Though the analysis is not quite the same, personal involvement is also an essential component to NYSHRL claims.

Under the NYSHRL, there are two pathways to individual liability. *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 521-22 (S.D.N.Y. 2015). First, a person may be held liable as an employer. *See Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012). An employer has "an ownership interest in the relevant organization or the power to do more than carry out personnel decisions made by others." *Id.* (internal citations and quotation marks omitted). The archetypal example of an employer is an individual with the power to hire or fire. *See Ahmad v. N.Y.C. Health & Hosps. Corp.*, 2021 WL 1225875, at *13 (S.D.N.Y. Mar. 31, 2021).

Second, a co-worker can be held personally liable as an aider and abettor "if they [personally] participate in the conduct giving rise to a discrimination claim." *Feingold*, 366 F.3d at 158-59 (cleaned up). Counterintuitive as it may seem, a coworker who by all accounts is the sole source of discriminatory misconduct is still culpable not as a principal, but as an aider and abettor. *Conklin v. Cty. of Suffolk*, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012) (noting that defendant may be held liable for aiding and abetting allegedly

unlawful discrimination by employer even where actions are predicate for employer's vicarious liability).

That is because the NYSHRL prohibits discrimination by *employers*, so any misconduct by an employee who lacks the requisite authority to be classified as an employer only aids and abets the employer's discrimination. *Compare* N.Y. EXEC. LAW § 296(1)(a) (making it unlawful for "employer" to discriminate on basis of race or gender identity or expression, among others), *with id.* § 296(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel[,] or coerce the doing of any of the acts forbidden under this article[.]").  By extension, a coworker who participates in discriminatory misconduct can be held liable under the NYSHRL as long as he participates in misconduct for which an employer is also liable, either directly or vicariously.  *Ahmad*, 2021 WL 1225875, at *13.

But the obvious counterpoint also holds true: a coworker cannot aid and abet the employer if the employer itself cannot be held liable.  *See Jain v. McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011) ("[L]iability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor.").  And imputing liability to an employer under the NYSHRL is no mean feat.  Vicarious liability under that statute requires the plaintiff to prove that "the employer encourage[d], condone[d], or approve[d] of the conduct."  *Maney v. Corning,*

*Inc.*, 547 F. Supp. 2d 221, 230 (W.D.N.Y. 2007) (citing *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007) (collecting cases)); *see Totem Taxi, Inc. v. N.Y. State Hum. Rts. Appeal Bd.*, 480 N.E.2d 1075, 1077 (N.Y. 1985).

Comparing the personal involvement requirements under § 1983 and the NYSHRL, there are two apparent differences.  First, unique to the NYSHRL is a requirement that the misconduct in question be fairly attributable to the plaintiff's employer.  *Jain*, 827 F. Supp. 2d at 277.  Second, unlike § 1983, the NYSHRL allows for a limited amount of supervisory liability if the supervisor actively condoned the discriminatory behavior.  *Maney*, 547 F. Supp. 2d at 230.

As a consequence, the analysis for personal involvement under the NYSHRL mostly tracks with the analysis under § 1983, except liability is narrower in circumstances where no employer can be held liable for a coworker's conduct, yet broader if there are allegations that an employer did not actively participate in discriminatory behavior but nevertheless condoned it.

To navigate the extent to which those two distinctions have practical consequences, the first step is sorting out who among Peck's defendants qualifies as an employer.  The NYSHRL seems to define that term narrowly to *only* include those with the authority to hire, fire, and discipline.  *See Hoit*

38

*v. Cap. Dist. Transp. Auth.*, 2018 WL 2324050, at *12

(N.D.N.Y. May 22, 2018).

Even so, plaintiff has plausibly alleged that every defendant attacking the complaint for a lack of personal involvement is either an employer within the meaning of the NYSHRL or has worked with an employer's approval.  Every defendant that has argued a lack of personal involvement either sits atop the Sheriff's Office food chain and can thus for now safely be assumed to have hiring and firing authority (Conway and Cassalia), has threatened Peck with discipline (DeMari, Smith, and Pellizzari), or allegedly worked in concert with a person with hiring authority (Gonzalez).

The only close call is Curry-Clarry.  The proposed amended complaint offers precious little support for Curry-Clarry's capacity to discipline, and Peck does not offer an alternative employer that her alleged misconduct could have aided and abetted.

However, Peck has alleged that Curry-Clarry investigated misconduct.  Compl. ¶ 44.  Though not the strongest support for Curry-Clarry's status as an employer, that alleged fact nevertheless allows for the plausible inference that where the power to investigate leads, the power to punish follows close behind.  Plaintiff's NYSHRL claims against Curry-Clarry remain intact for now.  Accordingly, there is an employer to answer for every discriminatory and retaliatory act plaintiff alleges against

these seven defendants, and the Court need not dismiss any NYSHRL claims that survived the § 1983 personal involvement analysis.

As a second step, the Court must determine whether any claims dismissed under § 1983 for a lack of personal involvement can nevertheless survive under the NYSHRL's slightly laxer standard of supervisory liability.

Upon careful review, they cannot.  Peck adequately pled direct personal involvement against every defendant except for Cassalia, so whether supervisory liability would also attach is a moot point.  As for Cassalia, Peck has not adequately alleged that he "encourage[d], condone[d], or approve[d]" of any alleged misconduct.  *Maney*, 547 F. Supp. 2d at 230.  Plaintiff's only allegations against him concern his not remedying discrimination once it was brought to his attention.  Compl. ¶¶ 40, 42.  But there is a world of difference between not addressing discrimination and actively condoning it.  Holding Cassalia liable without that affirmative step is impermissible, even under the NYSHRL.

Accordingly, Counts III and IX of the proposed amended complaint must be dismissed against Cassalia.  *See Maney*, 547 F. Supp. 2d at 230; *but see, e.g.*, *Mosier v. State Univ. of N.Y.*, 2020 WL 42830, at *7 (E.D.N.Y. Jan. 2, 2020) (refusing to dismiss NYSHRL employer claim where allegations included comments by employer defendant about "covering for"

abuser).  Otherwise, Peck's NYSHRL claims must remain intact along the same lines as her § 1983 claims.

## C. Conspiracy

Proving a § 1983 conspiracy requires a plaintiff to show: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Id.*  That does not shelter a complaint from dismissal if it brings only "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (internal citations and quotation marks omitted).

Unlike her § 1985 conspiracy claims, Peck did not voluntarily dismiss her § 1983 conspiracy claims in her proposed amended complaint.  But neither did she defend them in her opposition to defendants' motion.

It is not hard to see why.  Courts in the Second Circuit recognize the "intracorporate conspiracy doctrine," which holds that the "officers, agents, and employees of a single corporate entity are legally incapable of conspiring

together." *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (internal citations and quotation marks omitted).

The Second Circuit has routinely applied the doctrine to § 1985 claims, although it has not yet applied it to claims under § 1983. *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015). However, most courts in this Circuit have applied the intracorporate conspiracy doctrine to § 1983 conspiracies as well, reasoning that which statute a court is applying does not alter the doctrine's foundational logic. *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013) (collecting cases).

That logic runs like this: a conspiracy by definition must involve multiple people. *Chamberlain*, 986 F. Supp. 2d at 388. But if everyone involved in the conspiracy acted as an agent of the same corporate entity, in reality the acts were not borne out by a conspiracy of individuals, but by a single corporate actor. *See id.* Because municipalities are themselves corporations, the same logic has been extended to local governments as well. *See Broich v. Inc. Vill. of Southampton*, 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009) (applying intracorporate conspiracy doctrine to village).

There is, however, an exception to the intracorporate conspiracy doctrine. If the alleged conspirators are "motivated by an improper personal interest separate and apart from that of their principal," they may still conspire. *Chamberlain*, 986 F. Supp. 2d at 388. For example, "where law enforcement

allegedly exercises official duties in unconstitutional ways . . . to secure personal benefit," those law enforcement officers can enter a conspiracy. *Alvarez v. City of N.Y.*, 2012 WL 6212612, at *3 (S.D.N.Y. Dec. 12, 2012). Fittingly enough, this exception is commonly referred to as the "personal stake" exception. *Ali*, 136 F. Supp. 3d at 282-83.

As an initial matter, this Court agrees that the logic behind the intracorporate conspiracy doctrine carries over from § 1985 to § 1983. *See Chamberlain*, 986 F. Supp. 2d at 388 (collecting cases for principle that intracorporate conspiracy doctrine should apply to § 1983 claims as well).

What is more, Peck has not identified any uniquely unique benefit for any defendant that would justify invoking the personal stake exception. *Ali*, 136 F. Supp. 3d at 282-83. Courts have employed the personal stake exception where police officers have infringed the plaintiff's rights to cover up for their use of excessive force, engaged in race-based false arrests to pad their numbers for promotion, or acted out of pure spite. *See id.* (collecting cases).

The only motives plaintiff alleges are retaliation and discrimination. Although there is an argument to be made that acting under either mental state is not in the County's best interest, applying the personal stake exception in this case would allow every discrimination and retaliation claim in an employment setting would become an exception to the otherwise-broad

exception of intracorporate insulation.  For obvious reasons, that cannot be the rule.  Accordingly, Count VI of the proposed amended complaint must be dismissed against all defendants.  *See, e.g.*, *Chamberlain*, 389-90 (dismissing claim of conspiracy to discriminate on basis of race against officers of police department under intracorporate conspiracy doctrine).

## D. <u>First Amendment Retaliation</u>

A plaintiff hoping to prove out a claim of First Amendment retaliation must plausibly allege that "(1) h[er] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against h[er]; and (3) there was a causal connection between this adverse action and the protected speech."  *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011).  If the plaintiff is a public employee, there is a two-part inquiry to determine whether her speech is protected.  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

The Court begins by asking "whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action . . . ."  *Garcetti*, 547 U.S. at 418 (citation omitted). Alternatively, if the answer is yes, then the plaintiff may have a viable First Amendment claim, but only if the government entity did not have an "adequate justification for treating the employee differently from any other member of the general public."  *Id.*

44

A matter of public concern "relat[es] to any matter of political, social, or other concern to the community." *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* An employee's motive in speaking is not dispositive standing alone. *Sousa v. Roque*, 578 F.3d 164, 173 (2d Cir. 2009). However, "[a]n employee who complains solely about h[er] own dissatisfaction with the conditions of h[er] own employment is speaking upon matters only of personal interest." *Id.* at 174.

Peck's First Amendment retaliation claim is a close call. Remember, plaintiff has alleged that "[a]t a June 18, 2020 forum on race held at Onondaga Community College, [p]laintiff spoke to . . . Conway and Cassalia. She reported the discriminatory behavior of . . . Kelly . . ., Jon . . ., and Trask. Both assured her not to worry." Compl. ¶ 40.

As plaintiff's airing of a workplace grievance makes plain, the content of plaintiff's would-be protected speech concerned a personal interest rather than a public one. *See Singer*, 711 F.3d at 339 (charging court to analyze content of speech in assessing whether it was of public or private interest). But on the other hand, the context seems just as plainly to be public. *Id.* (charging court to consider context as well). Plaintiff broached the

conversation at a public forum discussing the plainly public issue of race, and plaintiff's own complaints touched on the same theme.  Compl. ¶ 40.

Accordingly, the deciding factor is the form of Peck's expression.  *Singer*, 711 F.3d at 339.  The Court has more questions than answers on that final point.  Did plaintiff make her complaint as part of the forum, as if she were a member of the public?  Or was she simply there as part of her job in the Community Relations Department, and brought it up because it was an opportunity when she had Conway and Cassalia in the same room?  Plaintiff's single paragraph does not provide much help on that front, but it does not really need to.  Drawing all reasonable inferences in plaintiff's favor, the ambiguity of the form and the apparently public nature of the exchange is enough to make plaintiff's claim plausible.  Plaintiff's First Amendment retaliation claim must survive defendants' motion.

The Court notes, however, that Peck does not allege any novel retaliatory conduct related to this instance of speech.  Instead, the alleged retaliatory acts plaintiff relies on for support are the same as the retaliatory acts for her Equal Protection retaliation claims.  By extension, the proposed amended complaint's lack of allegations concerning Cassalia's personal involvement for race-based discrimination and retaliation applies with equal force to Peck's First Amendment retaliation claim.  *Tangreti*, 983 F.3d at 618 (requiring direct participation in alleged violation to sustain personal involvement in

46

§ 1983 claim).  Count XI of the proposed amended complaint must be dismissed as to Cassalia as well.

### E. Intentional Infliction of Emotional Distress

New York requires four elements to sustain a claim of intentional infliction of emotional distress: (1) "extreme and outrageous conduct"; (2) "intent to cause, or disregard of a substantial probability of causing, severe emotional distress"; (3) "a causal connection between the [outrageous] conduct and injury"; and (4) "severe emotional distress."  *Howell v. N.Y. Post Co.*, 612 N.E. 2d 699, 702 (N.Y. 1993).

This species of tort is disfavored by New York courts.  *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014) (noting that intentional infliction of emotional distress "remains a highly disfavored tort under New York law." (cleaned up)).  In particular, the first element of outrageous conduct is "rigorous, and difficult to satisfy."  *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 488 (S.D.N.Y. 2013) (quoting *Howell*, 612 N.E. 2d at 702)).  In fact, the conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983).

47

"Insults, bullying, and general harassment do not usually constitute a claim for [intentional infliction of emotional distress] under New York law." *Gorman*, 146 F. Supp. 3d at 535.  Neither does failing to investigate or appropriately respond to claims of harassment to "two, three, or four complaints." *Turley*, 774 F.3d at 161 (noting that in vast majority of cases failing to respond to complaints is not enough to support intentional infliction of emotional distress claim but upholding jury verdict on that claim when supervisor failed to act on observed harassment for three years and actively blocked investigation into threats).

As a result, "New York courts regularly deny intentional infliction of emotional distress claims in employment discrimination cases." *Daniels v. Health Ins. Plan*, 2005 WL 1138492, at *3 (S.D.N.Y. May 12, 2005) (collecting cases).  In fact, the Second Circuit has held that forcing a plaintiff to take a polygraph under suspicion of theft solely because of her race is not enough to state a claim for intentional infliction of emotional distress.  *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985).

Measured against that high bar, Peck's intentional infliction of emotional distress claims cannot help but fall short.  Before June of 2020, plaintiff alleges a series of "insults, bullying, and general harassment."  These allegations are not enough to state a claim for intentional infliction of emotional distress by default.  *See Gorman*, 146 F. Supp. 3d at 535.  Neither

do denials of benefits, threats of suspension, or faulty investigations stack up.

*See Ifill v. United Parcel Serv.*, 2005 WL 736151, at \*1, 7

(S.D.N.Y. Mar. 29, 2005) (finding that claims that defendant "harassed,

discriminated, and retaliated against [p]laintiff" did not state cause of action

in absence of claims of sexual harassment or battery, threats, public

humiliation, false accusations, or permanent deprivation of employment).

Plaintiff's intentional infliction of emotional distress claims under Count XIII

must therefore be dismissed. *See, e.g.*, *id.*

## F. <u>Tortious Interference</u>

Defendants next argue that Peck has failed to state a claim for tortious

interference with a contract.

Under New York law, "the elements of tortious interference with contract

are (1) the existence of a valid contract between the plaintiff and a third

party; (2) the defendants' knowledge of the contract; (3) the defendant's

intentional procurement of the third-party's breach of the contract without

justification; (4) actual breach of the contract;" and (5) resulting damages.

*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (internal

citations and quotation marks omitted).

However, "[w]hen the claim arises in the employment context and the

defendants are co-employees, the plaintiff must allege that the

defendants-employees exceeded the bounds of their authority in order to

49

satisfy the 'third-party' requirement." *Wolongevicz v. Town of Manlius*, 2018 WL 3769857, at \*17 (N.D.N.Y. Aug. 8, 2018). "A supervisor is considered to have acted outside the scope of his employment if there is evidence that the supervisor's manner of interference involved independent tortious acts such as fraud or misrepresentations, or that he acted purely from malice or self-interest." *Id.*

Peck's theory for her tortious interference claim is that the CBA guaranteed her that the County would not "discriminate in a manner contrary to law with regard to the application of the terms and conditions" of the CBA. Compl. ¶ 107. By extension, plaintiff seems to be arguing that because she experienced discrimination, the CBA's guarantee that the County would not discriminate was breached.

But there is a glaring hole in Peck's claim that seems to have escaped both parties' attention. Specifically, § 301 of the Labor Management Relations Act of 1947 ("§ 301") mandates that federal law apply to all claims that turn on interpreting a CBA. *See* 29 U.S.C. § 185(a); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988) ("[I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is pre[]empted.").

Of course, determining whether a defendant induced the County to breach the CBA requires determining whether the CBA was actually breached. *See*

*Kirch*, 449 F.3d at 401 (including actual breach as element of tortious interference with contract).  And determining whether a contract was breached inevitably requires interpreting the contract.  *See Anderson v. Aset Corp.*, 329 F. Supp. 2d 380, 383 (W.D.N.Y. 2004), *aff'd*, 416 F.3d 170 (2d Cir. 2005).

Determining whether the CBA was breached under New York law would thus require this Court to impermissibly apply state law in interpreting a CBA.  *Lingle*, 486 U.S. at 405-06.  Accordingly, Peck's tortious interference with a contract claim under Count XIV must be dismissed against all defendants as pre-empted by § 301.  *See, e.g.*, *Wilson v. New York*, 2017 WL 9674497, at *28-29 (E.D.N.Y. Jan. 24, 2017) (dismissing tortious interference claim based on CBA and alleging discrimination as preempted by § 301).

## G. **Prima Facie Tort**

Finally, defendants argue that Peck's claims of prima facie tort must also be dismissed.  To that end, New York law requires a plaintiff to prove four elements to sustain a claim of that sort: "(1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful."  *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990).

51

The problem with Peck's claim of prima facie tort is that it pursues redress for precisely the same injuries that her discrimination and retaliation claims are looking to remedy.  Courts routinely dismiss prima facie tort claims as duplicative under these precise circumstances, and this Court will join their number.  *See, e.g.*, *Hamilton v. Cty. of Onondaga*, 2018 WL 4554496, at *20 (N.D.N.Y. Sept. 21, 2018) (collecting cases for proposition that prima facie tort claims are dismissed where duplicative of other claims).  Count XV of the proposed amended complaint must be dismissed.

### H. Leave to Amend and Time to Answer

To the extent that the claims in the proposed amended complaint have not been dismissed above as futile, the Court sees no reason to deny Peck's motion for leave to amend.  Neither have defendants pointed to one.  Accordingly, plaintiff is granted leave to amend her complaint consistent with both the proposed amended complaint and this opinion.

Lastly, defendants' motion to wait to answer the complaint until after the Court rules on its pending motion to dismiss is moot.  Under Rule 12(a)(4), serving a motion under Rule 12 resets the responsive pleading deadline to "within [fourteen] days after notice of the court's" deciding the motion.

## V. CONCLUSION

In summary, Peck's claims under Counts: (IV) race discrimination under § 1981; (VI) conspiracy to discriminate under § 1983; (X) retaliation under

§ 1981; (XIII) intentional infliction of emotional distress; (XIV) tortious interference with a contract; and (XV) prima facie tort must all be dismissed. Additionally, all claims against defendant Cassalia individually have been dismissed, and so he must be dismissed from the case.  Similarly, plaintiff's claims sounding in religious and gender discrimination must be dismissed as insufficiently pled.

The remaining claims going forward are: (I) Title VII race discrimination against the County; (II) NYSHRL race discrimination against the County; (III) NYSHRL race discrimination against defendants Conway, Trask, Jonathan, Kelly, DeMari, Curry-Clarry, Smith, Pellizzari, Gonzalez, and the Does; (V) Section 1983 race discrimination; (VII) Title VII retaliation against the County; (VIII) NYSHRL retaliation against the County; (IX) NYSHRL retaliation against Conway, Trask, Jonathan, Kelly, DeMari, Curry-Clarry, Smith, Pellizzari, Gonzalez, and the Does; (XI) First Amendment § 1983 retaliation; and (XII) Equal Protection § 1983 retaliation.

Therefore, it is

ORDERED that

1. Defendants' motion to dismiss plaintiff Kamilla Peck's complaint is GRANTED in part and DENIED in part;

2. Plaintiff Kamilla Peck's motion to amend her complaint is GRANTED in part and DENIED in part;

3. Plaintiff Kamilla Peck's claims under Counts: (IV) race discrimination under § 1981; (VI) conspiracy to discriminate under § 1983; (X) retaliation under § 1981; (XIII) intentional infliction of emotional distress; (XIV) tortious interference with a contract; and (XV) prima facie tort, are DISMISSED;

4. Defendant Jason Cassalia is DISMISSED;

5. Plaintiff Kamilla Peck's claims for discrimination based on religion and gender are DISMISSED;

6. Plaintiff Kamilla Peck's claims under Counts: (I) Title VII race discrimination against the County; (II) NYSHRL race discrimination against the County; (III) NYSHRL race discrimination against defendants Conway, Trask, Jonathan, Kelly, DeMari, Curry-Clarry, Smith, Pellizzari, Gonzalez, and the Does; (V) Section 1983 race discrimination; (VII) Title VII retaliation against the County; (VIII) NYSHRL retaliation against the County; (IX) NYSHRL retaliation against Conway, Trask, Jonathan, Kelly, DeMari, Curry-Clarry, Smith, Pellizzari, Gonzalez, and the Does; (XI) First Amendment § 1983 retaliation; and (XII) Equal Protection § 1983 retaliation, remain; and

7. Defendants are directed to answer the amended complaint in

   accordance with this memorandum-decision and order.


IT IS SO ORDERED.


Dated: August 19, 2021
      Utica, New York.

David N. Hurd
U.S. District Judge