UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KAMILLA PECK,

           *Plaintiff*,

     v.

COUNTY OF ONONDAGA, NEW YORK;
ONONDAGA COUNTY SHERIFF EUGENE
CONWAY; CHIEF KATHERINE TRASK;
SERGEANT JONATHAN SEEBER; DEPUTY
KELLY SEEBER; CHIEF DEPUTY SUSAN
DeMARI; DIRECTOR OF EMPLOYEE
RELATIONS DAWN CURRY-CLARRY;
CAPTAIN PAULA PELLIZZARI; CHIEF
DEPUTY ESTEBAN GONZALEZ; and
PAUL SMITH,

           *Defendants*.
_____

**DEFENDANTS' LOCAL RULE
7.1 STATEMENT OF
MATERIAL FACTS**


Civ. No. 21-cv-651 (DNH/TWD)

       Defendants County of Onondaga (the "County"), Eugene Conway, Katherine Trask, Jonathan Seeber, Kelly Seeber, Susan DeMari, Dawn Curry-Clarry, Paula Pellizzari, Esteban Gonzalez, and Paul Smith (the "individual Defendants"; collectively herein with the County, the "Defendants"), by and through their attorneys, Bolanos Lowe PLLC (Kyle Sturgess, of counsel), pursuant to Local Rule of Civil Procedure 7.1, hereby submit that there is no genuine issue of material facts with respect to the following material facts in the above-captioned action:

### BACKGROUND: THE COUNTY AND THE PLAINTIFF

       1.     Onondaga County maintains an Administrative Directive Manual ("ADM") that contains policies for the prevention of harassment ("Prevention of Sexual Harassment") as well as for the prevention of harassment, discrimination, and retaliation ("Harassment, Discrimination, and Anti-Retaliation").  Clarry Decl. at ¶3 and Ex. A, B.

2.      These policies not only define and establish prohibitions on harassment, discrimination, and retaliation, but also contain provisions for the reporting and investigation of prohibited behaviors.  Clarry Decl. at ¶4 and Ex. A, B.

3.      In addition, the policies contain an appeal mechanism for complainants who believe that County investigative determinations misapplied the relevant policy; rendered determinations not supported by the available evidence; did not factor new or key evidence into the determination; or mismanaged the investigatory process.  Clarry Decl. at ¶4.

4.      Investigators from the County Personnel Department most commonly perform internal investigations of complaints made to the County, sometimes with the direct participation and assistance of the agency or office where the complaint originated.  Clarry Decl. at ¶4.

5.      Within the Onondaga County Sheriff's Office ("OCSO"), Written Directive SHR-009 prohibits harassment, including racial harassment, and retaliation in the OCSO.  Trask Decl. at ¶7, Ex. B.

6.      SHR-009 requires OCSO staff members to report harassing actions or words that violate the Directive; additionally, it obligates supervisory staff to "comply with Onondaga County policy governing the manner in which to investigate and take action regarding alleged harassment and/or discrimination upon receipt of a complaint on an Onondaga County Harassment & Discrimination Complaint Form."  Trask Decl. at Ex. B.

7.      The Custody Department is one of four Departments within the OCSO, the other three being the Correction Department; the Civil Department; and the Police Department.  Gonzalez Decl. at ¶4.

8.      The Custody Department is responsible, generally, for the housing and care of pre-trial and pre-sentence inmates held at Onondaga County's Justice Center.  Gonzalez Decl. at ¶4.

9.       From December 2019 to 2022, the Civil Department was led by Chief Deputy Susan DeMari.  DeMari Decl. at ¶¶3-4.

10.      The Plaintiff's Department, meanwhile (Custody), was led from December 2012 until December 2022 by Chief Deputy Esteban Gonzalez.  Gonzalez Decl. at ¶3.

11.      Defendant Gonzalez never served as the Plaintiff's direct supervisor.  Gonzalez Decl. at ¶5.

12.      Defendant Conway never directly supervised the Plaintiff, reviewed her performance, directed her day-to-day activities, or issued her discipline.  Conway Decl. at ¶3.

13.      The Community Relations Unit performs community-engagement and outreach activities on behalf of the OCSO.  J. Seeber Decl. at ¶3; K. Seeber Decl. at ¶3.

14.      Those engagement and outreach activities include issue-awareness events such as bicycle safety programs, child car seat installation assistance, child fingerprinting programs, and community presentations.  J. Seeber Decl. at ¶3; K. Seeber Decl. at ¶3; Kruger Decl. at ¶3.

15.      Between 2016 and the end of 2022, Sergeant Jon Seeber—who also served for much of the same time period as the OCSO's Public Information Officer—was a member of the Community Relations Unit ("CRU") and the direct, day-to-day supervisor to all of the Deputies assigned there.  J. Seeber Decl. at ¶3.

16.      Until early 2020, Sergeant Seeber reported to Undersheriff  Jason Cassalia with respect to his duties in the CRU; in early 2020, after Katherine Trask was named the Chief of Staff Services and assumed oversight of the CRU, Sergeant Seeber reported directly to Chief Trask.  J. Seeber Decl. at ¶4.

17. The Custody Department is responsible for caring for persons awaiting trial or sentencing at the Onondaga County Justice Center, including their housing, medical care, recreation and visitation. Gonzalez Decl. at ¶4.

18. The Plaintiff began working for the OCSO as a Custody Deputy in April 2006. Sturgess Decl., Ex. E at 23.

19. The Plaintiff worked in Housing units at the Justice Center from the beginning of her career as a Custody Deputy until transferring to the Community Relations Unit in April 2018. Sturgess Decl., Ex. E at 39-42.

20. The Sheriff's Office, during some of the relevant time period, had four Departments: Civil, Police, Custody, and Correction. Gonzalez Decl. at ¶4; Conway Decl. at ¶4.

21. In early 2020 a new Department, Staff Services, was created, and Kate Trask was appointed Chief of that Department. Gonzalez Decl. at ¶5; Trask Decl. at ¶3.

22. During her time serving at the Justice Center the Plaintiff made a series of written complaints against colleagues and supervisors. Sturgess Decl., Ex. G-K.

23. In June 2008, the Plaintiff submitted a written memorandum reporting an "unprofessional order" against a Custody Sergeant, characterizing his behavior toward her as "unprofessional," "demeaning," "intimidating" and "offensive," although on deposition the Plaintiff did not characterize her complaint as one for racial discrimination or retaliation. Sturgess Decl. at Ex. G.

24. On October 28, 2010, days after being issued a supervisor's memorandum by a direct supervisor (a custody sergeant), the Plaintiff submitted a written complaint about the same supervisor (Sergeant Jane DeMarco), accusing her of "harassing" the Plaintiff. Sturgess Decl. at Ex. H, I.

25.     On deposition the Plaintiff stated that she "did not indicate any racial discriminat[ion]" in her complaint and characterized her problems with Sergeant DeMarco as "more a personality conflict.  Sturgess Decl., Ex. E at 68-70; 73-74.

26.     On June 14, 2011 or 2012, the Plaintiff submitted a written complaint for "harassment" against a Custody Sergeant, Pam Witek.  Sturgess Decl. at Ex. J.

27.     On February 14, 2014 the Plaintiff submitted an "Onondaga County Employee Harassment and Discrimination Complaint Form" alleging improper treatment by a co-worker on the basis of "race" and "weight."  Sturgess Decl. at K.

28.     The complaint concerned Plaintiff's fronting money for an "outside baby shower" for which the colleague at issue did not pay the Plaintiff back.  Sturgess Decl., Ex. E at 105.

29.     In connection with her February 14 complaint the Plaintiff testified that she and the colleague were ordered "to be professional on duty and to keep it to professional…working relationship when we're on duty."  Sturgess Decl., Ex. E at 106-107.

**2017 and 2019 Custody Sergeant Promotions**

30.     Promotions to Sergeant within the OCSO are made on the basis of recommendations from promotion "boards" or panels which are assembled, review information about, and interview all eligible candidates who wish to be considered.  Gonzalez Decl. at ¶9.

31.     Promotion panels are assembled ad hoc from the personnel available to serve on them at any given time.  Guillaume Decl. at ¶6; D'Eredita Decl. at ¶5.

32.     The Plaintiff was considered for promotion to Sergeant by promotion panels in 2017 and 2019.  Guillaume Decl. at ¶4; D'Eredita Decl. at ¶4.

33.     Captains Guillaume and D'Eredita both served on the Plaintiff's 2017 and 2019 promotion panels.  Guillaume Decl. at ¶4; D'Eredita Decl. at ¶4.

34.    For a Sergeant promotion, the personnel who could sit on the promotion board could be any OCSO officer from the rank of Lieutenant upwards.  D'Eredita Decl. at ¶5.

35.    Each promotion board is headed by a "chair," but the chair enjoys no special weight over other board members with respect to the board's ultimate ranking of candidates or recommendations for selection to appointment.  Guillaume Decl. at ¶6; D'Eredita Decl. at ¶5.

36.    The pool of African-American personnel presently available to sit on a Sergeant promotion board includes at least three individuals: Lieutenants Moore, Dykes, and Bell. Gonzalez Decl. at ¶9.

37.    The promotion process commences with a canvassing of "reachable" candidates based on their scores on a Civil service examination for Sergeant.  Guillaume Decl. at ¶5; D'Eredita Decl. at ¶6.

38.    Those reachable candidates are invited to interview with the board for promotion. Guillaume Decl. at ¶7; D'Eredita Decl. at ¶6.

39.    In advance of the interview, the board reviews the candidates' human-resources files, as well as their "supervisor's memos," both positive and negative; and invite candidates to submit a resume or additional documentation to the board.  Guillaume Decl. at ¶7; D'Eredita Decl. at ¶7.

40.    Board members also learn about candidates through on-the-job direct interactions with the candidates, through incident investigation, and through Internal Affairs investigations. Guillaume Decl. at ¶7; D'Eredita Decl. at ¶7.

41.    Promotion boards do not have a strict formula for weighting the positive and negative elements in a candidate's history; information is considered from the perspective of

whether it has implications for that candidate's potential to be a first-line supervisor.  Guillaume Decl. at ¶8; D'Eredita Decl. at ¶8.

42.     In interviewing candidates, promotion boards use a list of identical questions that are asked of each interviewee and consolidated in writing in an interview "packet."  Guillaume Decl. at ¶9; D'Eredita Decl. at ¶10.

43.     At least several of the interview questions are referred to as "scenarios" because they present hypothetical situations to which the interviewee is asked how he or she would respond as a sergeant.  Guillaume Decl. at ¶9; D'Eredita Decl. at ¶10.

44.     Each answer is scored on the basis of comprehensiveness, reasonableness, and how well they reflect an understanding of the Department's various areas of operation.  Guillaume Decl. at ¶9; D'Eredita Decl. at ¶11.

45.     A separate section in the interview "packet" contains space for the summary of the interviewee's background, which is also scored.  Guillaume Decl. at ¶10; D'Eredita Decl. at ¶10.

46.     In the experience of past board members Captains Guillaume and D'Eredita, candidates with broad Departmental experience may possess an advantage over those who have a narrow experiential skill set; i.e., the more areas of Department operations an interviewee has worked in or cross-trained in, the more likely he or she will be able to transition into a supervisory role which may require working on other parts of the Department.  Guillaume Decl. at ¶10; D'Eredita Decl. at ¶10.

47.     In the experience of past board members Guillaume and D'Eredita, the breadth of an interviewee's Departmental knowledge also aids his or her ability to respond competently to the "scenario" questions.  Guillaume Decl. at ¶10-11; D'Eredita Decl. at ¶10.

48.     Seniority or time in service, standing alone, is not a significant factor in a candidate's background.  Guillaume Decl. at ¶12.

49.     Likewise, while Civil Service examination scores may be discussed or noted in the promotion process, their primary function is to get a candidate "in the door" to the process. D'Eredita Decl. at ¶6.

50.     One of the fastest-rising officers in the Custody Department, African-American Lieutenant Corey Moore, was promoted to Sergeant just six years after joining the Department and to Lieutenant two years after that.  Guillaume Decl. at ¶13.

51.     Based on the outcome of the interviews, the board develops a ranking of the candidates and the chair of the board submits that ranking with a memorandum of recommendation for filling the sergeant vacancy, to the Chief Custody Deputy.  Guillaume Decl. at ¶14.

52.     The Chief Custody Deputy, in turn, reviews the recommendation and then submits a recommendation to the Sheriff, who makes the ultimate appointment for all vacancies. Guillaume Decl. at ¶14; Gonzalez Decl. at ¶11.

53.     Defendant Gonzalez never disagreed with a recommendation of a board and submitted a different candidate to the Sheriff for promotion during his tenure as Chief Custody Deputy.  Gonzalez Decl. at ¶11.

54.     In 2019, Peck's Department-relevant experience and interview performance was assessed as lower than eventual promotees Ben Okun, who is Mexican-American, and Loretta McCarty.  Guillaume Decl. at ¶¶15-17 and Ex. C, D; D'Eredita Decl. at ¶¶12-15 and Ex. A-C.

55.     Deputy Okun had previously worked in multiple Department units including booking, transport, control and training; had served on the Sheriff's Emergency Response Team ("SERT"); served as a Field Training Officer ("FTO," an officer who provides training to new

Deputies and recruits); and graduated from an additional training academy (the Police Academy). Guillaume Decl. at ¶16 and Ex. D; D'Eredita Decl. at ¶14 and Ex. B.

56.     Deputy Okun's experience was reflected in clear, comprehensive, well-thought out responses to the scenarios.  Guillaume Decl. at ¶16; D'Eredita Decl. at ¶14.

57.     Deputy McCarty had also served as an FTO, and her answers demonstrated a broader understanding of Departmental operations outside of her own unit (housing).  D'Eredita Decl. at ¶15, Ex. C.

58.     The Plaintiff's narrower range of experience within the Department was reflected in a struggle to offer complete and organized responses to the "scenario" questions; additionally, the Plaintiff also failed to tie her experience to a later question about why she should be recommended over the other candidates.  Guillaume Decl. at ¶17; D'Eredita Decl. at ¶13.

59.     In 2017, the Plaintiff experienced similar difficulty in answering scenario questions, given her narrow experience working solely in housing.  Guillaume Decl. at ¶18; D'Eredita Decl. at ¶17.

60.     By comparison, Deputies Ashbarry and Saddock, who were promoted as a result of the 2017 panel, both had additional experience derived from serving on a SERT team.  Guillaume Decl. at ¶18.

61.     Deputy Saddock had also served as an FTO and volunteered for focus groups (which are used to study and consider changes to Department policies or practices).  Guillaume Decl. at ¶18.

62.     Deputy Peterson, who also competed for promotion in this panel, likewise had served as an FTO, aiding her general Departmental knowledge base and signaling the presence of leadership skills as well as professional relationship-building skills.  Guillaume Decl. at ¶18.

63.     The demographic makeup of the applicant pools for promotion within the OCSO can be distorted, because the OCSO is obligated to use Civil Service examinations in its hiring process, and not all demographic groups take Civil Service examinations at the same percentage as their representation in the population at large.  Clarry Decl. at ¶¶19-20.

64.     Likewise, because score cutoffs are used in "canvassing" applicants for hiring or promotion, differences in average scores between demographic groups can affect the makeup of the eligible candidate pool.  Clarry Decl. at ¶¶19-20.

65.     In 2018, there were only three African-American exam-takers on the list for Custody sergeant, out of 28 total candidates, and two scored a 75, which could have left them "unreachable" for promotion.  Clarry Decl. at Ex. C.

66.     In 2019, there was one African-American exam-taker on the list for Custody Sergeant, out of a total of 27 candidates.  Clarry Decl. at Ex. C.

**Plaintiff's 2018 Transfer to the CRU**

67.     In 2018, a posting became available for a special Deputy assignment in the CRU.  J. Seeber Decl. at ¶6.

68.     The Plaintiff sought the assignment, along with several other Deputies.  J. Seeber Decl. at ¶6.

69.     By transfer order dated April 16, 2018, the Plaintiff was reassigned from the Justice Center to the CRU and Sergeant Seeber became her direct supervisor.  Sturgess Decl., Ex. E at 43-44.

70.     The Plaintiff interviewed with Undersheriff Jason Cassalia and Sergeant Jon Seeber in the course of applying for the assignment in the CRU.  J. Seeber Decl. at ¶6; Sturgess Decl., Ex. E at 151-52.

71.     Undersheriff Cassalia and Sergeant Seeber chose the Plaintiff to fill the vacancy in the CRU.  J. Seeber Decl. at ¶6.

72.     Sergeant Seeber never told Plaintiff, nor did he believe, that she had been selected to the CRU, or was in the CRU, because she was black.  Sturgess Decl., Ex. F at 14.

73.     Once Plaintiff left the Justice Center to work under a different Department, she no longer fell under Defendant Gonzalez' authority for purposes of day-to-day assignment, discipline, issuance of supervisors' memos, or performance review.  Gonzalez Decl. at ¶6.

74.     For example, Defendant Gonzalez received two grievances filed by the Plaintiff after her transfer to CRU but denied them at the first step of the grievance-and-arbitration process because the alleged contract violations had taken place outside the Custody Department, and referred them to the Civil Department for investigation and further proceedings.  Gonzalez Decl. at ¶6, fn.1.

**Plaintiff's Tenure in the CRU, 2018-2020**

75.     Several other Deputies worked in or alongside the CRU during some or all of the Plaintiff's tenure there, including Deputy Katie Kruger; Deputy Heather Poland, who came to the CRU from the road patrol; and Deputy Kelly Seeber, who transferred into the unit in late 2019 from the Police Department.  K. Seeber Decl. at ¶4; Kruger Decl. at ¶3-5.

76.     Deputy Seeber is (and was at the relevant time) married to Sergeant Jon Seeber.  J. Seeber Decl. at ¶5; K. Seeber Decl. at ¶5.

77.     Deputy Seeber retired from the unit in July 2020.  K. Seeber Decl. at ¶3.

78.     Sergeant Seeber distributed day-to-day direction to Deputy Seeber, but for purposes of other supervisory functions such as discipline, payroll, overtime and performance evaluations, Deputy Seeber was supervised by the Undersheriff.  J. Seeber Decl. at ¶5; K. Seeber Decl. at ¶5.

79.     Deputy Kruger was highly involved in the unit's efforts to provide safe and proper child car seat installation to the public.  Kruger Decl. at ¶¶4-5.

80.     In connection with that effort, she was certified as a car seat "instructor," able to train and, in turn, certify other Deputies' qualification to install car seats.  Kruger Decl. at ¶4.

81.     Until approximately mid-2020, the CRU Defendants Seeber, Trask, and Deputy Seeber all maintained friendly working relationships with the Plaintiff.  K. Seeber Decl. at ¶7; Trask Decl. at ¶5; J. Seeber Decl. at ¶7.

82.     In early 2020, Community Relations was placed under the oversight of the new Staff Services Department, making Trask the Plaintiff's second-level supervisor.  Trask Decl. at ¶¶3-4; J. Seeber Decl. at ¶4.

83.     The Plaintiff stated on deposition that she had a "very amicable professional working relationship with [Seeber] and the rest of [her] colleagues" during her initial transfer to CRU.  Sturgess Decl., Ex. E at 198.

84.     Trask and the Plaintiff frequently went for bagels together in the morning.  Trask Decl. at ¶5.

85.     Deputy Seeber and Chief Trask routinely texted with the Plaintiff about a mix of work and non-work related matters.  Trask Decl. at ¶5; K. Seeber Decl. at ¶7.

86.     The Plaintiff reached out to Kate Trask by text, for example, to inform Trask of her master's in Royal Caribbean Certification, because Trask had told her that Royal Caribbean was her family's cruise ship of choice.  Sturgess Decl., Ex. E at 28-29.

87.     The Plaintiff always worked an 0800-1600 shift during her time in the CRU, although she would sometimes work outside of those hours for events.  Sturgess Decl., Ex. E at 156-57.

88.     Chief Trask and the Plaintiff discussed cruise lines; the Plaintiff's becoming a grandmother; Trask's own first pregnancy; and Trask's wedding, which the Plaintiff attended. Trask Decl. at ¶5.

89.     Deputy Seeber and the Plaintiff referred to one another by nicknames, and the Plaintiff left affectionate notes for Deputy Seeber at her desk.  K. Seeber Decl. at ¶8, Ex. A.

90.     The Plaintiff testified at deposition that she had never received a negative supervisor's memorandum from Sergeant Seeber.  Sturgess Decl., Ex. E at 93.

91.     The Plaintiff testified at deposition that she had received positive supervisor's memoranda from Sergeant Jon Seeber.  Sturgess Decl., Ex. E at 93.

92.     Sergeant Seeber administered annual performance evaluations to the Plaintiff in 2019 and 2020.  J. Seeber at ¶8 and Ex. A.

93.     In each instance Sergeant Seeber awarded the Plaintiff "standard" or "above average" rankings in a variety of performance and knowledge categories.  J. Seeber at ¶8 and Ex. A.

94.     The Plaintiff acknowledged her agreement with her evaluations in writing, and on deposition characterized her 2018 performance evaluation as a "not a bad evaluation."  J. Seeber Decl. at ¶8; Sturgess Decl., Ex. E at 165.

95.     The CRU Defendants Sergeant Seeber, Chief Trask, Deputy Seeber, and the Plaintiff also formed an informal lunch group that was referred to as the "salad club."  Trask Decl. at ¶5; K. Seeber Decl. at ¶7.

96.     Each member was tasked with bringing in various ingredients for salads and the members would then prepare and have lunch together.  K. Seeber at ¶7.

97.     During one in-office group lunch at which the Plaintiff, Deputy Seeber, and Chief Trask were present, the Plaintiff and Deputy Seeber engaged in a conversation about the celebrities each resembled.  K. Seeber Decl. at ¶9; Trask Decl. at ¶24.

98.     Deputy Seeber used her phone to search for and retrieve pictures of African-American actress Octavia Spencer, whom she believed the Plaintiff resembled, to show the Plaintiff.  K. Seeber Decl. at ¶9.

99.     The Plaintiff disagreed that she resembled Spencer but did not state any objection to the pictures that Deputy Seeber had retrieved.  K. Seeber Decl. at ¶9.

100.    The Plaintiff subsequently gave Deputy Seeber a "selfie" picture to associate with her contact information in Deputy Seeber's phone, which Deputy Seeber used.  K. Seeber Decl. at ¶10.

101.    The Plaintiff exchanged a series of appreciative messages and jokes with Sergeant Seeber by text during her tenure at the CRU, until at least the spring of 2020.  See generally J. Seeber Decl. at Ex. D.

102.    By way of example in May 2018 the Plaintiff told Sergeant Seeber by text, "You are such an awesome boss! Whatever I can do, please feel free to delegate it to me.  Thanks for your support!" J. Seeber Decl., Ex. D at DEF 004777.

103.    In or about July 2018 the Plaintiff, in response to Sergeant Seeber's advising her it was "no problem" that she might run late, texted Sergeant Seeber, "[Y]ou're the best!!!" J. Seeber Decl., Ex. D at DEF 004785.

104.    On March 28, 2019, the Plaintiff texted Sergeant Seeber a "bitmoji" animated character with the message, "New Phone[,] Who Dis?" while asking Sergeant Seeber to call her. J. Seeber Decl., Ex. D at DEF 004792.

105.    On the same day, she responded with a bitmoji with the message "True Dat!" in response to an instruction to use a conference room if it was available.  J. Seeber Decl., Ex. D at DEF 004793.

106.    Several hours later, after the Plaintiff received praise from Sergeant Seeber for a performance, which stated "You Go Girl…You did good!," the Plaintiff responded with a bitmoji bearing the message, "You Da Real MVP."  J. Seeber Decl., Ex. D at DEF 004794.

107.    In or about October 2018 the Plaintiff texted Sergeant Seeber the message, "You rock dude!"  J. Seeber Decl., Ex. D at DEF 013390.

108.    On October 28, 2018 the Plaintiff texted Sergeant Seeber the message, "Thanks for believing in me."  J. Seeber Decl., Ex. D at DEF 013391.

109.    In March 2020, the Plaintiff texted Sergeant Seeber a message that read, in part, "although we have good days and ok days, you are still dear to me," and "You will reap all of the great things that you have sown.  I will keep you in prayer.  We may disagree and laugh with each other, because we are a family.  But just know that you are very appreciated, especially by us who work so closely with you," accompanied by a heart emoji.  J. Seeber Decl., Ex. D at DEF 001537.

110.    In the course of communicating by text over the Plaintiff's tenure in CRU, Sergeant Seeber and the Plaintiff used a variety of emojis, including faces depicting different moods and hand signals such as "OK" or "thumbs-up" signals.  J. Seeber Decl. at ¶13 and Ex. D.

111.    The Plaintiff used different-colored emojis ranging from the default yellow color, to white-skinned hand signs, and black- or brown-skinned hand signs.  Seeber Ex. D at DEF 004778 (white skinned emoji); 004779 (white and brown-skinned hand emojis); 004780 (white skinned emoji); 004781 (brown-skinned arm emoji); 004782 (brown skinned hand emoji); 004783 (white skinned hand emoji); 004785 (white skinned hand emoji); 004786 (white skinned hand

emoji); 004787 (white-skinned and default yellow hand emojis); 004788 (brown-skinned and white-skinned hand emojis); 004789 (white skinned hand emoji); 004790 (white skinned hand emoji); 004791 (white skinned hand emoji); 004795 (white skinned hand emoji); 004976 (white skinned  hand emoji); 004797 (white skinned hand emoji); 013388 (white skinned hand emoji); 013391 (brown skinned praying hands emoji); 013394 (brown skinned praying hands emoji); 013395 (white skinned hand emoji); 013412 (brown skinned praying hands emoji); 013413 (white skinned hand emoji); 013414 (brown skinned praying hands emojis); 013416 (white skinned hand emoji).

112.    On a handful of occasions, Sergeant Seeber used a brown-hued "OK" hand emoji in text messages to the Plaintiff.  J. Seeber Decl. at ¶13.

113.    Sergeant Seeber did not pay particular attention to the color of the emojis he used and frequently selected whatever emoji option would auto-populate on his screen when the word "OK" was typed in text.  J. Seeber Decl. at ¶13.

114.    Prior to the mediation between the Plaintiff, Sergeant Seeber and Chief Trask on June 16, 2020, the Plaintiff raised no objection to color of any emojis used by Sergeant Seeber.  J. Seeber Decl. at ¶13.

115.    Indeed, in response to one use by Seeber of a brown-hued hand emoji, the Plaintiff responded with her own brown-hued "thumbs-up" hand emoji and the words, "you are too much!!" accompanied by three laughing-faced emojis.  J. Seeber Decl. at ¶13; Ex. D at DEF 004779.

116.    On one occasion in January 2020, Sergeant Seeber was unable to locate the Plaintiff, who was working out of the office, and repeatedly instructed the Plaintiff by text to call him.  J. Seeber Decl. at ¶14.

117.    When the Plaintiff failed to do so Sergeant Seeber, exasperated, sent an additional text message again instructing the Plaintiff to call him or he would have her "transfer papers" set for the jail (where her main mission as a Custody Deputy was located).  J. Seeber Decl. at ¶14, Ex. D at DEF 001523.

118.    The Plaintiff responded to the text by calling Sergeant Seeber, and made no complaint about the text message; five hours later, in fact, the Plaintiff placed a coffee order with Sergeant Seeber by text.  J. Seeber Decl. at ¶14, Ex. D at DEF 001523.

119.    Sergeant Seeber never verbally told the Plaintiff he would "throw her back to the jail." J. Seeber Decl. at ¶14.

120.    Neither Defendant Trask nor Defendant Seeber ever mocked the Plaintiff's accent. J. Seeber Decl. at ¶9; Trask Decl. at ¶¶6-7.

121.    Plaintiff admitted on deposition that she never filed a written complaint, until her internal complaint of June 2020, over the alleged mocking of her speech or dialect.  Sturgess Decl., Ex. E at 204-205.

122.    In preparation for her first media appearance as a Public Information Officer—an opportunity that the Plaintiff had requested and that Sergeant Seeber identified for her—Sergeant Seeber gave the Plaintiff a series of reminders and pointers for dealing with the media, including telling her to enunciate and speak clearly.  J. Seeber Decl. at ¶9.

123.    The Plaintiff did not object or complain at being offered this advice, and Sergeant Seeber in fact praised her for her good performances in media appearances.  J. Seeber Decl. at ¶9.

124.    The Plaintiff did register one complaint about "unprofessional behavior" and "intimidation" with Sergeant Seeber—against a sergeant in charge of a firing range who yelled at

the Plaintiff while she was qualifying on the range in October 2019.  J. Seeber Decl. at ¶11 and Ex. C.

125.    Sergeant Seeber took a written statement from the Plaintiff and referred the matter for investigation by Internal Affairs.  J. Seeber Decl. at ¶11 and Ex. C.

126.    IA subsequently investigated the Plaintiff's allegations.  DeMari Decl. at ¶8 and Ex. B.

127.    Neither Chief Trask nor Sergeant Seeber "rifled" Plaintiff's desk.  Trask Decl. at ¶27; J. Seeber Decl. at ¶17.

**Plaintiff's August 7, 2019 Injury And 207-c Process**

128.    On August 7, 2019 the Plaintiff fell on the sidewalk outside the OCSO headquarters building—which was covered in sandbags and orange construction fencing and partially blocked off for construction or repair—while preparing to leave for a CRU event.  J. Seeber Decl. at ¶15; K. Seeber Decl. at ¶11 and Ex. B.

129.    The Plaintiff complained to Deputy Seeber, who was present at the time of the fall but did not see the fall itself, that an artificial nail had been torn off to the nail bed, and that her shoulder and arm hurt.  K. Seeber Decl. at ¶11, Ex. B.

130.    Deputy Seeber completed a witness affidavit as part of an injury-on-duty ("IOD") report completed by Sergeant Seeber, as the Plaintiff's first-line supervisor, for submission to Human Resources.  J. Seeber Decl. at ¶15.

131.    As part of compiling the materials for his IOD report Sergeant Seeber requested the surveillance video from the front of the OCSO headquarters building, which showed the Plaintiff's fall, and placed a copy of it into a manager's file for the Plaintiff that he maintained on his computer.  J. Seeber Decl. at ¶15.

132.    After Deputy Seeber learned that Sergeant Seeber had received the footage, she asked to view it because she was having difficulty remembering where she was oriented at the time of the fall, to have missed the fall itself.  J. Seeber Decl. at ¶16; K. Seeber Decl. at ¶12.

133.    Sergeant Seeber also showed the video to Kate Trask, who at the time was still the executive secretary to the Sheriff and who kept advised about safety and maintenance issues around the building, to report them to the Sheriff and relay his instructions about them.  J. Seeber Decl. at ¶16; Trask Decl. at 8.

134.    Deputies Seeber and Poland also viewed the video on one subsequent occasion after Deputy Poland expressed doubt about the severity of the Plaintiff's injuries and Deputy Seeber informed her that there was video of the fall on Sergeant Seeber's computer.  K. Seeber Decl. at ¶12.

135.    During none of these three viewings did any of the participants laugh at or mock the Plaintiff's injury.  Trask Decl. at ¶9; J. Seeber Decl. at ¶16.

136.    The Plaintiff sought to claim benefits under General Municipal Law §207-c following her August 7, 2019 fall on the sidewalk outside the OCSO headquarters.  DeMari Decl. at ¶13.

137.    207-c benefits pay full salary and wages, including medical treatment costs, for law enforcement personnel who fall ill or are injured in the line of duty.  DeMari Decl. at ¶9.

138.    A 207-c committee exists to review claims for 207-c benefits and render initial determinations on those claims.  DeMari Decl. at ¶¶9-12.

139.    During the relevant time period the committee consisted of four members including a "Sheriff's Designee" (which was the Chief Civil Deputy); a member of OCSO Human resources;

an independent consultant not affiliated with the County; and an individual from the County's risk management office.  DeMari Decl. at ¶¶9-12.

140.    The committee does not have a formal chair, nor does any member direct the votes of the other members.  DeMari Decl. at ¶10.

141.    The committee reviews claims for 207-c benefits with the assistance of nurse case managers, who "present" the employees' cases to the committee for review and translate the medical information therein for lay understanding.  DeMari Decl. at ¶10; Smith Decl. at ¶5.

142.    The committee and the nurse managers rely on a wide array of information sources including employee injury reports, supervisors' reports and witness affidavits; surveillance video, if available; medical documentation from treating healthcare providers; and the results of independent medical examinations, or IMEs.  DeMari Decl. at ¶¶10, 12; Smith Decl. at ¶5.

143.    IMEs are conducted by third-party medical personnel to examine an employee's medical status and/or determine injury causation.  DeMari Decl. at ¶12; Smith Decl. at ¶¶5-6.

144.    The 207-c committee may request an IME, but does not select or appoint the doctor for this purpose.  DeMari Decl. at ¶12; Smith Decl. at ¶6.

145.    Multiple IMEs may be requested for an employee, for example in instances where an initial IME does not provide enough information for the committee to render a determination, or where some measure of time has elapsed since a prior determination and the committee wants to update itself on the employee's prognosis or status.  DeMari Decl. at ¶12; Smith Decl. at ¶6.

146.    Based on the information provided and the nurse case managers' "presentation" of cases, the committee votes either to approve benefits, deny them, or leave the matter pending (in the event more information is needed).  DeMari Decl. at ¶10; Smith Decl. at ¶7.

147.     All committee votes during the relevant time period were by consensus: that is, by 4-0 vote.  Smith Decl. at ¶7; DeMari Decl. at ¶11.

148.     When committee members were in disagreement over whether to approve or deny benefits, the practice during the relevant time period was to vote to leave the matter pending and seek more information.  DeMari Decl. at ¶11; Smith Decl. at ¶7.

149.     Moreover, the committee may revisit determinations and revise them based on new information, so that a claimant initially receiving benefits might be denied later if the claimant had fully healed and was capable of returning to work at full duty.  DeMari Decl. at ¶12.

150.     Alternatively, a claimant who had been denied benefits might later be approved for benefits based on the receipt of new information.  DeMari Decl. at ¶12.

151.     On January 15, 2020, the committee—including Chief DeMari—voted 4-0 to approve limited 207-c benefits for the Plaintiff.  DeMari Decl. at ¶13 and Ex. C.

152.     The following month, on February 13, 2020, based on the results of an IME that assessed the Plaintiff had reached maximum medical improvement, and the Plaintiff having already returned to work full-duty, the committee voted 4-0 to deny 207-c benefits.  DeMari Decl. at ¶14 and Ex. D, E.

153.     During her tenure on the committee Chief DeMari likewise voted to deny benefits to Caucasian members of the OCSO.  DeMari Decl. at ¶17 and Ex. F.

154.     The Plaintiff made a second claim for 207-c benefits in late September 2020, when she alleged the aggravation of a work injury while at a therapy session (a chiropractic visit).  DeMari Decl. at ¶18.

155.     After a review of her September 2020 claim, the Plaintiff's claim for benefits was denied on or about February 17, 2021, on a variety of grounds, including the untimeliness of her claim submission.  DeMari Decl. at ¶19, Ex. G.

156.     The Plaintiff appealed both the February 2020 and February 2021 denial of benefits. DeMari Decl. at ¶¶18-20 and Ex. H.

157.     The denials were consolidated for hearing before Hearing Officer Randy Ray, Esq., who rendered a decision on February 5, 2023, following four days of hearing on the Plaintiff's appeals, affirming the County's denial of benefits to the Plaintiff with respect to both February 2020 and February 2021.  DeMari Decl. at Ex. H.

158.     In addition to witness testimony the evidence at hearing included over fifty documentary exhibits.  DeMari Decl. at Ex. H.

159.     Hearing Officer Ray issued a decision on the County's February 2020 and February 2021 denial of 207-c benefits to the Plaintiff on February 5, 2023.  DeMari Decl. at Ex. H.

160.     The decision upheld the County's denial of benefits as to both the Plaintiff's February 2020 appeal, and her September 2021 appeal.  DeMari Decl. at Ex. H.

161.     Aside from her submission of a witness affidavit to the Plaintiff's fall, Deputy Seeber had no input as to the committee's determination on the Plaintiff's applications for 207-c benefits.  K. Seeber Decl. at ¶13.

162.     Sergeant Seeber's perceptions of the Plaintiff's injury and her entitlement to 207-c benefits were never requested, nor did he offer them, to anyone involved in the Plaintiff's 207-c determination process.  J. Seeber Decl. at ¶19.

163.    Chief Trask had no input as to the committee's determination on the Plaintiff's application for 207-c benefits, except to the extent that a video clip of the Plaintiff dancing at her wedding was requested from her.  Trask Decl. at ¶¶10-11.

### Car Seat Certification Issues

164.    Child car seat events are an important part of the CRU's community functions because the need for public education  on the use of car seats is widespread, ongoing, and directly implicates child safety.  Kruger Decl. at ¶5.

165.    Individuals who have been certified to install car seats are known as Child Passenger Safety Technicians ("CPSTs" or "technicians" and in turn are trained and certified (and re-certified) by certified instructors.  Kruger Decl. at ¶¶4, 6.

166.    Deputy Kruger was and remains a certified instructor who can recertify CPSTs. Kruger Decl. at ¶4.

167.    CPSTs are required to re-certify their fitness to perform car seat installations every two years, consisting of continuing-education and event requirements, and performing all five different types of car seat checks under the observation of a certified instructor.  Kruger Decl. at ¶6.

168.    Deputy Kruger observed and certified her observation of members of the OCSO that were CPSTs; sometimes by setting up a time to meet and having the CPST perform all the installations at one time, and sometimes by observing CPSTs in the field performing all five types of car seat checks within the requisite two-year period.  Kruger Decl. at ¶6.

169.    Deputy Kruger left the CRU in October 2018 but continued to be involved in training, certifying and recertifying CPSTs.  Kruger Decl. at ¶7.

170.     Deputy Kruger experienced difficulty conducting observations of the Plaintiff in the field because the Plaintiff appeared to be agitated by Deputy Kruger's presence or advice at car-seat events.  Kruger Decl. at ¶8.

171.     In the spring of 2020, Deputy Kruger was unable to sign off on the Plaintiff's recertification of her CPST status at the Plaintiff's request, because she had not seen the Plaintiff perform the requisite car seat checks within the two-year window for certification or recertification.  Kruger Decl. at ¶8.

172.     Deputy Kruger has never re-certified an individual technician without having observed him or her perform all the required car seat checks in the required two-year window.  Kruger Decl. at ¶9.

173.     Deputy Kruger did not dislike the Plaintiff and did not leave the CRU because of the Plaintiff, but because she obtained a favorable School Resource Officer ("SRO") assignment close to her home.  Kruger Decl. at ¶10.

174.     On approximately June 11, 2020, Sergeant Seeber and Chief Trask had a meeting with the Plaintiff to discuss the need to ensure that her certification was renewed in order for the CRU to continue providing car-seat checks and installation services to the public, in light of the impending retirement of Deputy Seeber and the recent departure of Heather Poland (both of whom were also car-seat tech certified).  Trask Decl. at ¶¶14-16.

175.     Deputy Kruger, who was certified as a car-seat installation instructor, was intended to observe the Plaintiff installing a car seat, in order to re-certify the Plaintiff as an installation technician.  Trask Decl. at ¶¶14-16.

176.     At the June 11 meeting, however, the Plaintiff angrily resisted the idea of being observed by Deputy Kruger, arguing that Deputy Kruger treated her poorly, although the Plaintiff

did not specifically describe Deputy Kruger's supposed treatment, even in response to Chief Trask's question.  Trask Decl. at ¶¶14-16.

177.     Sergeant Seeber and Chief Trask offered the Plaintiff the options of holding a meeting between them and Deputy Kruger, to discuss and hopefully resolve the Plaintiff's unhappiness with Deputy Kruger; as well as offered to be present during the observation, to ensure that Deputy Kruger did not mistreat the Plaintiff.  Trask Decl. at ¶16.

178.     The Plaintiff rejected both options, and the meeting ended without resolution with respect to the Plaintiff's recertification.  Trask Decl. at ¶16.

**June 2020 "After Action Report" Incident**

179.     In late May and early June 2020 the County experienced a wave of protests and unrest over the recent murder of George Floyd by police, and the headquarters and vehicles of the OCSO were targets of vandalism and damage.  Trask Decl. at ¶19.

180.     In early June Chief Trask was directed by the Sheriff to submit an after-action report ("AAR") concerning how the office had responded to the violence.  Trask decl. at ¶19; J. Seeber Decl. at ¶10.

181.     Defendant Trask, in turn, sent an email to her supervisors with questions to pass on to their employees regarding how the office had handled the violence, what had been done well and what could be done differently.  Trask Decl. at ¶20 and Ex. C; J. Seeber Decl. at ¶10.

182.     Defendant Trask directed her supervisors to finish the survey by June 12, because she believed the matter to be time-sensitive and she needed to prepare her own report to the Sheriff. Trask Decl. at ¶20 and Ex. C.

183.     On the morning of June 15 Chief Trask learned that Sergeant Seeber had still not received a response from the Plaintiff.  Trask Decl. at ¶21.

184.   The Plaintiff told Chief Trask that she had forgotten about the report.  Trask Decl. at ¶21.

185.   Confronted with a lack of good reason to have complied with an order, Chief Trask elected to direct Sergeant Seeber to write a supervisor's memorandum to the Plaintiff.  Trask Decl. at ¶21.

186.   No supervisor's memorandum was actually issued to the Plaintiff over her failure to comply with the directive to submit a report by June 12.  J. Seeber Decl. at ¶10.

**June 18, 2020 Forum**

187.   The Plaintiff testified that she received the "blessing" of the Sheriff in June 2020 to organize and/or facilitate a forum on racial healing on June 18 and was directed to "put it together."  Sturgess Decl., Ex. E at 223-24.

188.   The Plaintiff testified on deposition that the forum was a community relations event, because the Sheriff told her "Kamilla, you're community relations, so guess what, you totally can do this, this is up your alley."  Sturgess Decl., Ex. E at 223-24.

189.   The forum took place at Onondaga Community College; the Sheriff attended and participated in a question-and-answer session with attendees.  Conway Decl. at ¶10.

190.   The Plaintiff did not discuss her internal complaints of racial harassment and discrimination with the Sheriff at the forum.  Conway Decl. at ¶10.

191.   Likewise, although Monica Williams, the Chief Diversity Officer for the County's Office of Diversity and Inclusion also attended the forum and saw the Plaintiff, the Plaintiff did not speak to Ms. Williams about her internal complaints of harassment and/or discrimination. Williams Decl. at ¶5.

**June 2020 Mediation Session**

192.     On or about June 15, 2020, following the conversation over the AAR, the Plaintiff's Union representative, Kevin Moore, asked Chief Trask and Sergeant Seeber for a "mediation" session between them and the Plaintiff, with himself present, to discuss concerns that the Plaintiff purportedly had regarding her working environment.  J. Seeber Decl. at ¶12; Trask Decl. at ¶23.

193.     The "mediation session" was held on June 16, 2020, with Chief Trask later committing her observations and recollections to writing.  Trask Decl. at ¶23 and Ex. E.

194.     The "mediation" session was largely guided by Deputy Moore.  Trask Decl. at ¶23.

195.     At the meeting, the Plaintiff raised a number of issues that were allegedly bothering her, including the use of brown-skinned emojis in text; the fact that her co-workers had seen video footage of her August 7, 2019 fall on the sidewalk; her continued discomfort with being observed by Deputy Kruger performing car seat installations; the fact that she felt she had not been treated with sympathy upon returning to work after her mother's death; an assignment given to her and Deputy Poland to go pick up masks and deliver them to a loading dock, which the Plaintiff believed was not a CRU task; the Plaintiff's perception that Chief Trask had been "argumentative" with her by asking her to check in with Sergeant Seeber; and the allegation that Deputy Seeber had made fun of the similarities between the Plaintiff and African-American actress Octavia Spencer.  Trask Decl. at ¶¶23-24 and Ex. E.

196.     Chief Trask did not assess the Plaintiff's complaints as being about racial discrimination, but some appeared to have a racial dimension, so she sought guidance on what steps to take next by discussing the mediation session with Chief DeMari.  Trask Decl. at ¶24.

197.     When the June 2020 mediation session concluded, at which the Plaintiff stated that she was upset with the use of brown-skinned emojis, Sergeant Seeber apologized to the Plaintiff for anything that had upset her.  J. Seeber Decl. at ¶13.

**Plaintiff's June 2020 Internal Complaint and Investigation**

198.    After hearing from Chief Trask about the "mediation," Chief DeMari sent the Plaintiff an Onondaga County Employee Harassment and Discrimination Complaint form by email, directing the Plaintiff to fill it out and submit it to herself or to Dawn Clarry by email. DeMari Decl. at ¶¶21-22 and Ex. I.

199.    Chief DeMari provided these instructions to the Plaintiff pursuant to what Chief DeMari believed were her responsibilities as a supervisor, to report complaints of discrimination or harassment within the OCSO, including under SHR 009.  DeMari Decl. at ¶25; Trask Decl. at Ex. B.

200.    The Plaintiff did not respond to Chief DeMari's offer to discuss options that would permit her to continue to work during the pendency of the investigation.  DeMari Decl. at ¶¶22-23; Sturgess Decl., Ex. E at 262-63.

201.    The Plaintiff thanked Chief DeMari in an email for the complaint form.  DeMari Decl. at ¶22-23, Ex. I.

202.    The Plaintiff, however, asserted at deposition that she considered DeMari's provision of the complaint form to her, to be itself a discriminatory and/or retaliatory action. Sturgess Decl., Ex. E at 241.

203.    After receiving the Plaintiff's 3:18 p.m. email and noting the Plaintiff's tone, Chief DeMari went to the Plaintiff's workspace to see if the Plaintiff was alright, but was unable to locate her.  DeMari Decl. at ¶23.

204.    The County's Deputy Commissioner of Personnel (and former Director of Employee Relations) Dawn Clarry had no awareness of protected-category harassment, discrimination or retaliation complaints by the Plaintiff prior to June 2020.  Clarry Decl. at ¶6.

205.   The Plaintiff went to see Dawn Clarry on June 22 after contacting Monica Williams, the County's Chief Diversity Officer for the Office of Diversity and Inclusion, appearing to want Ms. Williams to investigate her complaint.  Williams Decl. at ¶6.

206.   Ms. Williams, in turn, explained to the Plaintiff the type of complaints her office investigated; and directed the Plaintiff to see Dawn Curry-Clarry whom Ms. Williams assured the Plaintiff would fairly and appropriately investigate her complaint.  Williams Decl. at ¶6.

207.   After meeting with Dawn Clarry the Plaintiff emailed Ms. Williams to state that she had met with Dawn Clarry and that she had been "very kind," also revealing that she had been placed on administrative leave, which the Plaintiff did not object to.  Williams Decl. at ¶7.

208.   Defendant Curry-Clarry met with the Plaintiff in her private office when the Plaintiff came to the County Personnel office on June 22 to deliver her completed complaint form.  Clarry Decl. at ¶8.

209.   Defendant Curry-Clarry observed that the Plaintiff appeared extremely apprehensive and reassured the Plaintiff that she was assigning and investigator to her complaint and that the matter would be fully investigated.  Clarry Decl. at ¶8.

210.   Defendant Curry-Clarry also briefly explained the County's investigative process to the Plaintiff, including provisions to keep allegations and witness statements in confidence to the greatest extent possible.  Clarry Decl. at ¶8.

211.   Defendant Clarry assigned Vanessa Baker (at that time, Vanessa Campbell), an African-American female Employee Relations Officer, to investigate the Plaintiff's complaint.  Clarry Decl. at ¶¶10-11.

212.   Ms. Baker had prior workplace investigation experience in multiple roles with the County.  Clarry Decl. at ¶10; Baker Decl. at ¶3.

213. Defendant Curry-Clarry also spoke to the Undersheriff about pairing Ms. Baker with an Internal Affairs investigator.  Clarry Decl. at ¶10.

214. This proposal was designed so that the County investigator could focus on discrimination- or retaliation-related allegations while the IA investigator could look for potential violations of the OCSO's own internal work rules and directives, as well as help the County investigator navigate the structure of the OCSO.  Clarry Decl. at ¶10.

215. Ms. Baker was paired with Internal Affairs Lieutenant Jammie Blumer to investigate the Plaintiff's Complaint.  Clarry Decl. at ¶10.

216. Lieutenant Blumer was present for all of the interviews conducted by Ms. Baker in the course of the investigation.  Baker Decl. at ¶7.

217. Ms. Baker began her investigation by reviewing the Plaintiff's written complaint, interviewing her, and asking her to send emails, reports, text messages, and other documentation that the Plaintiff considered relevant to the complaint.  Baker Decl. at ¶8.

218. After reviewing the Plaintiff's materials Ms. Baker interviewed the three named respondents (Sergeant Seeber, Chief Trask, and Deputy Seeber) and requested complaint-related materials such as text messages, emails, and conversation notes from each of them.  Baker Decl. at ¶8.

219. Ms. Baker also interviewed Deputy Moore, Deputy Poland, and two OCSO civilian staff, Collette Reynolds and Madelyn Pellizzari.  Baker Decl. at ¶9.

220. Through her investigation Ms. Baker was free to set the scope of her inquiry in terms of witnesses and materials.  Baker Decl. at ¶10.

221. Ms. Baker was not directed by Defendant Clarry as to what to conclude; how to weight the evidence or witnesses; or what to recommend.  Baker Decl. at ¶10; Clarry Decl. at ¶11.

222.   Ms. Baker gave Defendant Clarry brief updates on the status of the investigation during the process, and Ms. Clarry read the final draft report before the investigation's findings were explained to the Plaintiff.  Clarry Decl. at ¶11.

223.   Ms. Baker ultimately concluded that the complaint was unfounded as a violation of the County's anti-discrimination and anti-harassment policies.  Baker Decl. at ¶11, Ex. A at DEF 001299-001306.

224.   Ms. Baker assessed that the relationship between the Plaintiff and respondents was generally very friendly and although there had been disagreements and some sharp exchanges between the Plaintiff and her superiors, none exhibited racial animus.  Baker Decl. at ¶11.

225.   Ms. Baker assessed that some of the issues the Plaintiff raised were related to race but not racially offensive under the County's policy and under the particular circumstances of the Plaintiff's situation.  Baker Decl. at ¶12.

226.   For example, Ms. Baker found that a conversation and disagreement the Plaintiff had had with Sergeant Seeber over the death of George Floyd was not itself racially offensive, because the conversation was about how much could be inferred solely from the video of Floyd's murder.  Baker Decl. at ¶12, Ex. A at DEF 001299-001306.

227.   Ms. Baker also found that the occasional use of skin-hued emojis in test messages between Sergeant Seeber and the Plaintiff did not violate the County's discrimination and harassment policies as both parties had used different color emojis interchangeably and without apparent objection.  Baker Decl. at ¶12 and Ex. A.

228.   Ms. Baker did, however, recommend discontinuing the use of any emojis other than the default yellow color.  Baker Decl. at 14, Ex. A at DEF 001305.

229.    She likewise recommended that the Plaintiff's supervisors receive training on leadership and boundaries in the workplace based on a conclusion that social and professional boundaries were blurred between subordinates and supervisors.  Baker Decl. at ¶14, Ex. A at DEF 001305.

230.    Ms. Baker and Defendant Clarry met the Plaintiff and her husband at the County Personnel office to review the findings and conclusions of the investigation.  Baker Decl. at ¶16; Clarry Decl. at ¶14.

231.    Ms. Baker described her findings to the Plaintiff, who was in disagreement with the ultimate conclusions.  Baker Decl. at ¶16; Clarry Decl. at ¶14.

232.    Defendant Clarry interjected to offer an example of how boundaries were blurred in the workplace, identifying a text exchange between the Plaintiff and Sergeant Seeber.  Clarry Decl. at ¶14; Baker Decl. at ¶16.

233.    Although the Plaintiff alleged in her complaint that the investigation failed to credit the testimony of "her" witness, Deputy Poland, the Plaintiff admitted on deposition that she did not know what Deputy Poland told the investigators when she met with them.  Sturgess Decl., Ex. E at 293-94.

234.    Likewise, although the County investigative process and anti-discrimination policies permit an appeal where, among other things, the complainant believes that evidence has been ignored or the determination was not supported by the available evidence, she never appealed the investigation's conclusions.  Clarry Decl. at ¶15.

235.    At the meeting to review the investigative findings the Plaintiff was offered two choices regarding her return to work, in order to ensure that she was comfortable: to return to the

CRU under a new supervisor, or to return to her main mission at the Justice Center.  Clarry Decl. at ¶14.

236.    The Plaintiff opted to remain in the CRU under a new supervisor.  Clarry Decl. at ¶14.

### Vehicle Assignment and Reassignment in the CRU

237.    Deputy Kelly Seeber was not personally assigned a car but used a car reserved for the CRU as needed.  K. Seeber Decl. at ¶14.

238.    The Plaintiff never had a car assigned to her until Deputy Kruger left the CRU; instead, she shared vehicles with others.  Sturgess Decl., Ex. E at 170 and 176.

239.    Deputy Poland was assigned an unmarked vehicle during her tenure in the CRU.  Trask Decl. at ¶¶30-31.

240.    Deputy Seeber was not assigned a vehicle during her tenure in the CRU.  K. Seeber Decl. at ¶14.

241.    The Plaintiff's car was placed back into road patrol service.  Trask Decl. at ¶30 and Ex. G.

242.    The Plaintiff's car was one that could easily be placed into patrol service by installing some interior equipment.  Trask Decl. at ¶30.

243.    During her tenure as the head of Fleet Management Chief Trask routinely pulled vehicles as needed from the OCSO training department as well as from School Resource Officers in order to keep the road patrol supplied.  Trask Decl. at ¶30.

244.    As a result of the COVID public-health emergency, parts and repair services were difficult to obtain at that time, and marked cars were prioritized to the road patrol.  Trask Decl. at ¶30.

245.     Additionally, the COVID public health emergency greatly curtailed the number of events that the CRU conducted in the field, diminishing the unit's need for vehicles.  Trask Decl. at ¶32; Pellizzari Decl. at ¶8.

246.     The CBA between the Plaintiff's Union and the OCSO does not govern the assignment or reassignment of vehicles to individual Deputies, except as to assignments made before the effective date of the CBA (2016).  Trask Decl., Ex. F.

247.     The Sheriff and his designees otherwise retain the discretion to reallocate vehicles on an as-needed basis.  Trask Decl., Ex. F.

248.     The pertinent language of the CBA states in Article 36 that "any assignment of a vehicle to a member…shall be made at the sole discretion of the Sheriff who shall determine the nature, extent, conditions and duration of such assignment.  Any such assignment of a vehicle shall not constitute a term and condition of employment."  Trask Decl., Ex. F.

249.     Chief DeMari, in a phone call to the Plaintiff on June 23, asked the Plaintiff, who had been placed on paid administrative leave, to turn in her assigned vehicle keys.  DeMari Decl. at ¶26.

250.     The Plaintiff admitted on deposition that she had no expectations of using her assigned vehicle while out on administrative leave.  Sturgess Decl., Ex. E at 179.

251.     Plaintiff had use of an OCSO vehicle when needed following her return in August 2020.  Pellizzari Decl. at s¶8.

## Internal Affairs Investigation

252.     When Chief DeMari first took over the Civil Department in December 2019, she discovered widespread use of a remote punch-in and punch-out mechanism referred to as "Tele-time."  DeMari Decl. at ¶¶5-6.

253.    Chief DeMari evaluated the use of this phone mechanism as part of a "SWOT" (Strengths, Weaknesses, Opportunities, and Threats) analysis of Departmental operations.  DeMari Decl. at ¶¶5-6.

254.    As a result of her "SWOT" analysis, Chief DeMari concluded that Tele-Time was subject to abuse and imposed new uniform practices for the use of the Tele-time mechanism. DeMari Decl. at ¶¶5-6.

255.    OCSO adopted a practice of requiring all Sheriff's Office members at or below the rank of Sergeant to use a conventional time clock to punch in and out of work, except in certain exceptional circumstances.  DeMari Decl. at ¶¶5-6.

256.    When Chief DeMari was unable to locate the Plaintiff after she went to check on her well-being on June 18, 2020, she reached out to Sergeant Seeber to confirm that the Plaintiff's duty hours ended at 1600 (4:00 pm).  DeMari Decl. at ¶26.

257.    Because Chief DeMari understood that the Plaintiff had not been given authorization to leave early, she asked an administrative assistant in the Human Resources section to conduct a limited time audit of the Plaintiff's most recent punches in and out of work.  DeMari Decl. at ¶26.

258.    The audit revealed that the Plaintiff had been "punched out" of work by a payroll clerk at 4:00 p.m.  DeMari Decl. at ¶26, Ex. J.

259.    However, security footage from the same day showed the Plaintiff departing the building and driving away in her personal vehicle nearly forty minutes earlier.  DeMari Decl. at ¶26.

260.    The time audit also showed that Ms. Fox had added several other "out" punches for the Plaintiff in recent weeks with no notation made in the record as to why she was entering the punch.  DeMari Decl. at ¶27 and Ex. J.

261.    At that time payroll staff had been advised not to enter punches at an employee's request, although they could do so at the request of that employee's supervisor.  DeMari Decl. at ¶27.

262.    The audit also found a number of Tele-time uses in spite of Chief DeMari's efforts to implement practices to curtail its use.  DeMari Decl. at ¶27.

263.    Chief DeMari understood that leaving early while claiming to have punched out at a certain, later time (i.e., "time theft") was potentially misconduct, as would be the unauthorized use of Tele-time, which multiple Caucasian members of the OCSO have been investigated by IA for and issued supervisory memoranda for.  DeMari Decl. at ¶29, Ex. L through P.

264.    A directive from Undersheriff Cassalia to all Chief Deputies instructed that any allegation of wrongdoing rising to the level of potential discipline had to be reported to Internal Affairs for investigation, as a matter of policy.  DeMari Decl. at ¶29 and Ex. K.

265.    Consequently, Chief DeMari was obligated to report her findings concerning the Plaintiff's departure on June 18, 2020 and her Tele-time use, as revealed in the time audit, to Internal Affairs for investigation.  DeMari Decl. at ¶29.

266.    Chief DeMari has referred other personnel to IA for investigation on suspicion of potential wrongdoing, including a Caucasian OCSO member.  DeMari Decl. at ¶31 and Ex. Q.

267.    The Plaintiff was not issued discipline as a result of the Internal Affairs investigative finding.  DeMari Decl. at ¶33.

268.    Instead, Chief DeMari directed Captain Paula Pellizzari—at that time, the Plaintiff's direct supervisor, following the Plaintiff's return to work from paid administrative leave—to issue the Plaintiff a supervisor's memorandum.  DeMari Decl. at ¶34.

269.    The Plaintiff admitted on deposition that the issuance of the supervisor's memorandum was not "discipline" and that she was not demoted, suspended, or cost any pay as a consequence of the memorandum.  Sturgess Decl., Ex. E at 94-95.

270.    The Plaintiff's departure from work and manner of punch-out were investigated by Internal Affairs Detective Steven Smollen.  DeMari Decl., Ex. R.

271.    Detective Smollen's case presentation (investigative report) documented that he conducted investigative interviews with Chief DeMari, Sergeant Seeber, Janice Fox of Human Resources; the Plaintiff; and a telephonic call with Deputy Jerami Christian.  DeMari Decl., Ex. R.

272.    Detective Smollen also reviewed email correspondence; internal memoranda regarding Tele-time use; and camera footage.  DeMari Decl., Ex. R.

273.    Detective Smollen's investigation concluded that the Plaintiff had violated three provisions of the OCSO Duty Manual; written directive SHR 008 ("Automated Time & Attendance"); and three County work rules.  DeMari Decl., Ex. R at DEF 000090-000091.

274.    Other OCSO employees, including Caucasian employees, have received supervisors' memos for leaving work as little as four minutes early.  DeMari Decl. at Ex. L, M.

275.    Other OCSO employees, including Caucasian employees, have been investigated by Internal Affairs and been the subject of an IA report, for misuse of the Tele-time mechanism.  DeMari Decl. at Ex. N, O, P.

276. Chief DeMari directed the Plaintiff's then-direct supervisor, Captain Pellizzari, to issue a supervisor's memo in response to the findings of the Internal Affairs investigative report. DeMari Decl. at ¶34.

277. In a June 11, 2020 email to his subordinate Chief Deputies, Undersheriff Cassalia specifically instructed them, "Please ensure that ANY cases whereas an allegation of wrongdoing by a member has been made, whether internally or externally, and the allegation rises to the level of possible discipline (starting at written reprimand through to seeking termination) or possible criminal conduct, the case is sent to IA for investigation. This is current policy." DeMari Decl. at Ex. K.

278. Chief DeMari referred the incident to the Internal Affairs bureau for investigation. DeMari Decl. at ¶28.

**August-November 2020: Supervision by Captain Pellizzari**

279. In July 2020 Captain Paula Pellizzari, who oversaw the OCSO's Human Resources and Grants Management sections, was appointed to be the Plaintiff's new direct supervisor, pursuant to the Plaintiff's choice to remain in the CRU under a new supervisor. Pellizzari Decl. at ¶3.

280. Captain Pellizzari understood that her appointment was partly an effort to protect the Plaintiff from any potential retaliation for her prior internal complaint, and assured the Plaintiff in an early telephone conversation with her that she would not tolerate any retaliation. Pellizzari Decl. at ¶¶3-4.

281. Captain Pellizzari received CRU assignments from Sergeant Seeber and/or Chief Trask to relay to the Plaintiff and passed the Plaintiff's work product back to Seeber and Trask. Pellizzari Decl. at ¶5 and Ex. A.

282.     Captain Pellizzari likewise relayed any feedback or further instructions on assignments to the Plaintiff from Seeber or Trask.  Pellizzari Decl. at ¶5; J. Seeber Decl. at Ex. E.

283.     The Plaintiff worked in the office under Pellizzari from early August to late September, when she left work alleging re-aggravation of a work-related injury; then returned in early November before again leaving work on or about November 17 and did not return.  Pellizzari Decl. at ¶6.

284.     During her time working under Captain Pellizzari's supervision the type of events that CRU was able to participate in was constrained by the ongoing Covid-19 pandemic.  Pellizzari Decl. at ¶¶7-8.

285.     Nevertheless, the Plaintiff performed an inventory of CRU items (such as brochures and promotional items); developed PowerPoint presentations for issues such as school safety); and was assigned to development of brochures.  Pellizzari Decl. at at ¶7; J. Seeber Decl. at ¶17-18.

286.     In addition the Plaintiff identified some projects for herself and participated in virtual career fairs and recruitment events, as well as fundraising drives for organizations and events such as Vera House and breast cancer awareness.  Pellizzari Decl. at ¶7.

287.     The Plaintiff did not complain to Pellizzari that her duties were unlike those she had performed previously in the CRU.  Pellizzari Decl. at ¶7.

288.     To the extent that the Plaintiff needed to use a vehicle during the period in which she was supervised by Pellizzari, she was able to use one from among the vehicles assigned to CRU.  Pellizzari Decl. at ¶8.

289.     In November 2020, the Plaintiff submitted a "bid sheet" indicating her preferred ranking of assignments for the following year.  Sturgess Decl., Ex. E at 325.

290.    The Plaintiff's November 2020 "bid sheet" reflected that the CRU was her first and second choice of assignments.  Sturgess Decl., Ex. E at 325.

291.    Both Chief Trask and Sergeant Seeber, as well as Deputy Seeber, have previously conducted inventories of the CRU's materials.  J. Seeber Decl. at ¶18; Trask Decl. at ¶28.

**OCSO Correspondence to the Plaintiff, 2021**

292.    By January of 2021, the Plaintiff's leave status was uncertain because she had exhausted her leave accruals, was no longer eligible for Family and Medical Leave Act (FMLA) leave, and she had been cleared to work with certain lifting restrictions.  DeMari Decl. at ¶35.

293.    Article 35 of the CBA between the Plaintiff's bargaining unit and the County ("Standards and Corrective Measures Policy for Absences Without Leave") sets forth a series of provisions governing absences including those "which are caused by serious injury or illness resulting in an inability to work and that are verified by the member's physician."  Hayden Decl., Ex. A.

294.    Under those provisions, "[m]embers are required to submit a physician's verification in writing to the Employer prior to but no later than three (3) business days from the beginning of the first day of absence except those members that cannot comply with the three business notification due to their verified physical incapacitation."  Hayden Decl., Ex. A.

295.    The same contract provision goes on to state that "[m]embers shall also be required to submit the form (Attached as Appendix C of this Agreement) fully completed within ten business days from the beginning of the first day of absence."  Hayden Decl. at Ex. A.

296.    The Plaintiff submitted a provider's note dated January 15, 2021, that she needed to be excused from work pending a re-evaluation in six weeks.  Smith Decl. at ¶12.

297.     However, the Plaintiff's provider's note was not accompanied by the likewise-required Appendix C form.  Smith Decl. at ¶¶12-13 and Ex. C.

298.     Appendix C forms are a routine component of bargaining unit members' long-term leave submissions.  Hayden Decl. at ¶5.

299.     Human Resources Manager Robert Hayden, who succeeded to Defendant Smith's position, sent letters on multiple occasions to bargaining unit members (including at least one Caucasian unit member) reminding them of their obligation to submit an Appendix C form.  Hayden Decl. at ¶5.

300.     The Plaintiff's union submitted a completed Appendix C form on or about February 5, 2021.  Smith Decl., Ex. F.

301.     The Plaintiff's union submitted a second Appendix C form on or about March 2, 2021.  Smith Decl., Ex. G.

302.     The Plaintiff was never issued any charges in connection with the delayed submission of her Appendix C forms or doctor's note.  Smith Decl. at ¶15.

303.     Plaintiff admitted on deposition that she was never disciplined for not turning in an Appendix C form.  Sturgess Decl., Ex. E at 369.

304.     Much of the correspondence issued from OCSO—a paramilitary organization—to its members containing orders or directives, is accompanied by a reminder to the recipient that noncompliance can lead to discipline.  Smith Decl. at ¶14.

305.     Defendant Smith incorporated similar language—i.e., warning of possible discipline—into letters to employees being directed to return to light-duty assignments, including Caucasian members of the OCSO.  Smith Decl. at ¶14 and Ex. D, E.

306.    During the same time period, Chief DeMari directed a Civil Deputy to attempt to serve the Plaintiff with paperwork in person.  DeMari Decl. at ¶42-43.

307.    Chief DeMari directed Civil Deputies to serve other OCSO employees with paperwork in person, including at least one Caucasian OCSO employee, Correction Officer Wheeler.  DeMari Decl. at ¶¶42-43.

308.    Chief DeMari's use of Civil Deputies to serve paperwork was partially to make use of the Department's process servers at a time when the COVID public-health emergency had decreased their workload.  DeMari Decl. at ¶43.

**Equipment Retrieval from the Plaintiff, 2021**

309.    Chief DeMari interpreted the language of SHR 014 as requiring the Plaintiff's equipment to be surrendered because she was not using accrued vacation, compensatory time, and was not on leave due to injury related to her employment, because she was not out of work due to a workers' compensation finding, and her 207-c benefits had been denied as the result of a finding that she was fit to return to duty and/or that her injuries were in any event not causally related to her employment.  DeMari Decl. at ¶¶35-36 and Ex. S.

310.    Whether the Plaintiff's circumstances triggered the requirement to surrender her equipment under SHR 014 was a question of first impression for Chief DeMari, who was unaware of any other Deputies being out of work under the same conditions.  DeMari Decl. at ¶41.

311.    The Plaintiff, through her Union, grieved the directive to turn in her equipment in March 2021 after having been out of work since November 2020.  DeMari Decl. at ¶38.

312.    That grievance was processed to arbitration and the matter was heard by an arbitrator at a July 12, 2022 hearing where the parties had the right to present oral and written

evidence; to examine and cross-examine witnesses; and to file post-hearing briefs.  DeMari Decl. at Ex. S.

313.    The Award issued by the arbitrator on October 14, 2022, found that there was no violation of the CBA by the County's recoupment of the Plaintiff's equipment pursuant to SHR 014, and denied the grievance.  DeMari Decl. at ¶39 and Ex. S.

314.    Plaintiff filed an administrative charge of discrimination in or about August 2020. Sturgess Decl., Ex. B.

315.    Plaintiff subsequently filed the instant lawsuit in Supreme Court, Onondaga County, on May 13, 2021.  Sturgess Decl. at ¶2.

316.    After removal to the Northern District of New York and subsequent motion practice, the operate Amended Complaint was filed on August 27, 2021.  Sturgess Decl. at Ex. A.

317.    Discovery in the case is complete and summary judgment for Defendants on Plaintiff's claims is appropriate.


Dated: February 27, 2023
      Pittsford, New York 14534               **BOLAÑOS LOWE PLLC**

                                          **/s/ _Kyle W. Sturgess_**
                                          Kyle W. Sturgess
                                          *Attorneys for Defendants*
                                          16 South Main Street
                                          Pittsford, New York 14534
                                          (585) 643-8440
                                          ksturgess@bolanoslowe.com