UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KAMILLA S. PECK,

       *Plaintiff*,

    -v-                      5:21-CV-651

COUNTY OF ONONDAGA,
NEW YORK; EUGENE
CONWAY, Onondaga County
Sheriff; KATHERINE
TRASK, Chief; JONATHAN
SEEBER, Sergeant; KELLY
SEEBER, Deputy; SUSAN
DeMARI, Chief Deputy; DAWN
CURRY-CLARRY, Director of
Employee Relations; PAUL
SMITH, Human Resources
Manager; PAULA PELLIZZARI,
Captain; ESTEBAN GONZALEZ,
Chief, JOHN DOE(S), and JANE
DOE(S), all in their individual
and official capacities as
representatives of Onondaga
County and/or the Onondaga
County Sheriff's Office,

       *Defendants*.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:              OF COUNSEL:

BOSMAN LAW FIRM, LLC      AJ BOSMAN, ESQ.
*Attorneys for Plaintiff*        ROBERT JAMES STRUM, ESQ.
3000 McConnellsville Road
Blossvale, New York 13308

BOLAÑOS LOWE PLLC                    KYLE W. STURGESS, ESQ.
*Attorneys for Defendants*
11 Schoen Place, Fifth Floor
Pittsford, New York 14534

DAVID N. HURD
United States District Judge

## **MEMORANDUM-DECISION and ORDER**

## I. **INTRODUCTION**

This is an employment discrimination action brought by plaintiff Kamilla Peck ("Peck" or "plaintiff") concerning her time working in the Onondaga County Sheriff's Office (the "Sheriff's Office"). Following this Court's August 19, 2021 Order, Dkt. No. 20, which dismissed several claims (as well as defendant Undersheriff Jason Cassalia ("Cassalia")), plaintiff filed an amended complaint consistent with its directives, Dkt. No. 24 ("Am. Compl."). The amended complaint asserts nine causes of action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296; and 42 U.S.C. § 1983 ("Section 1983"). *See generally id.* The remaining defendants[1] have answered, *see* Dkt. No. 26, and now move for summary judgment, Dkt.

---

[1] The amended complaint brings claims against a host of defendants: Onondaga County (the "County"), Sheriff Eugene Conway ("Conway"), Chief Katherine Trask ("Trask"), Sergeant Jonathan Seeber ("Jonathan"), Deputy Kelly Seeber ("Kelly"), Chief Deputy Susan DeMari ("DeMari"), Director of Employee Relations Dawn Curry-Clarry ("Curry-Clarry"), Human Resources Manager Paul Smith ("Smith"), Captain Paula Pellizzari ("Pellizzari"), Chief Esteban Gonzalez ("Gonzalez"), as well as an unspecified number of John and Jane Doe defendants (the "Does" and, together with each defendant other than the County, the "Individual Defendants") (collectively "defendants").

No. 75.  The motion has been fully briefed and the Court will now consider it on the basis of the parties' submissions without oral argument.

## II.  **<u>BACKGROUND</u>**[2]

Peck is a black woman who began working in the Sheriff's Office as a Custody Deputy in April 2006.  Dkt. No. 83-1, Plaintiff's Response to Defendants' Statement of Material Fact ("RSMF") ¶ 18.  In 2018, a posting became available for a Special Deputy assignment in the Sheriff's Office Community Relations Unit (the "CRU").  *Id.* ¶ 67.  Peck was ultimately assigned to the CRU in April 2018.  *Id.* ¶¶ 68–69.  In applying for the CRU position, plaintiff interviewed with Cassalia and Jonathan, who then chose her to fill the vacancy.  *Id.* ¶¶ 70–71.  Plaintiff claims Jonathan told her she had been selected for the CRU position because of her race, which he denies. *Id.* ¶ 72.

The Sheriff's Office also considered Peck for promotion to Sergeant in 2017 and 2019.  RSMF ¶ 32.  Any Sheriff's Office officer could sit on a Sergeant promotion panel provided they were the rank of Lieutenant or higher.

---

[2] Neither plaintiff nor defendants felt the need to appropriately frame the factual issues in this case by way of a fact section in their memoranda of law.  Instead, the parties seemingly expected the Court to parse a narrative out of 414 combined paragraphs in their statements of material facts and responses.  While the statements of material facts themselves are often disjointed and hardly tell a chronological story, this background section represents the Court's best effort to succinctly highlight the pertinent facts for the remaining causes of action.  The following facts are drawn from the parties' statements of undisputed material facts and responses pursuant to Local Rule 7.1(a)(3), to the extent those facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein.

*Id.* ¶ 34.  Each promotion panel is headed by a "chair," though defendants assert that the chair position enjoys no special weight.  *Id.* ¶ 35.  Plaintiff claims, without pinpoint citations to the record, that the chair's opinion is not weighed more heavily.  *See id.*

In Peck's view, she was "well qualified" for promotion to Sergeant, scoring highly on both the 2016 and 2018 Civil Service examinations.  Dkt. No. 88-1, Defendants' Response to Plaintiff's Statement of Additional Material Facts ("RSAMF") ¶ 1.  Defendants admit that based on her Civil Service scores, plaintiff was eligible (or, in their words, "reachable") for promotion, and thus invited to interview with the promotion panel.  RSMF ¶¶ 37–38.  However, defendants note that Civil Service examination scores primarily function as a way to get candidates "in the door" of the promotion process, rather than as a basis for making a final promotion decision.  *Id.* ¶ 49.  In advance of the interview, the promotion panel reviews candidates' human resources files and their "supervisor's memos," both positive and negative, and invites candidates to submit a resume or additional documentation.  *Id.* ¶ 39.  Board members also learn about candidates through direct interactions on the job, incident investigations, and Internal Affairs investigations.  *Id.* ¶ 40.

Sheriff's Office promotion boards do not have a strict formula for weighing candidates' histories; the boards consider whether a candidates' background speaks to their potential to be a first-line supervisor.  RSMF ¶ 41.  During

interviews, promotion boards use a list of identical questions for each interviewee, with several of the questions presenting hypothetical scenarios that ask candidates to respond from the perspective of a Sergeant. *Id.* ¶¶ 42–43. Defendants claim that promotion boards score each answer based on comprehensiveness, reasonableness, and how well the candidate demonstrates an understanding of the Sheriff's Office's various areas of operation. *Id.* ¶ 44. Peck disputes this characterization and claims that white candidates receive higher scores and greater latitude than black candidates. *Id.*

Past promotion board members note that candidates with broad experience among the Sheriff's Office's various departments may possess an advantage over those with a narrow experiential skill set. RSMF ¶ 46. In other words, the more departments a candidate has worked or cross-trained in, the more likely he or she will be able to transition into a supervisory role. *Id.* Standing alone, a candidate's seniority or time in service is not a significant factor in a promotion candidate's background. *Id.* ¶ 48.

Following the interview process, the promotion board ranks the candidates and the chair of the board submits that ranking to the Chief Custody Deputy along with a memorandum of recommendation for filling the vacancy. RSMF ¶ 51. The Chief Custody Deputy then reviews the recommendation

and submits a recommendation to the Sheriff, who makes the ultimate appointment for all vacancies.  *Id*. ¶ 52.

The parties do not offer much record evidence regarding the 2017 promotion process, but defendants claim that Peck had difficulty answering scenario questions during the interview panel.  RSMF ¶ 59.  For the 2019 promotion process, the panel assessed plaintiff's department-relevant experience and interview performance as lower than the eventual successful candidates.  *Id*. ¶ 54.  Contributing to plaintiff's lower performance compared to the successful candidates was her struggle to offer complete and organized responses to the scenario questions, as well as an inability to tie her experiences to why she should be recommended over the other candidates.  *Id*. ¶ 58.

Ultimately, in 2017, the Sheriff's Office promoted Deputy Ashbarry ("Ashbarry") and Deputy Saddock ("Saddock"), whom the promotion panel determined had additional experience from serving on the Sheriff's Emergency Response Team ("SERT").  RSMF ¶ 60.  Saddock had also served as a Field Training Officer ("FTO"), which is an officer who trains new Deputies and recruits, and had volunteered for focus groups that studied and considered changes to Sheriff's Office policies and practices.  *Id*. ¶ 61.  As plaintiff notes, however, both Ashbarry and Saddock had at least some critiques in their file as well; Asbarry's evaluation revealed that he was "new

6

to SERT" as of November 2017 evaluation, and Saddock's evaluation indicated that he should seek experience in other units.  RSAMF ¶¶ 13–14. The Sheriff's Office also promoted Deputy Keeney ("Keeney") over plaintiff in 2017.  *Id*. ¶ 16.  In Keeney's final evaluation before her promotion, the file indicated that she "need[ed] to have more confidence," though her promotion board interview also reflects sound departmental knowledge.  *Id*.

In 2019, the Sheriff's Office promoted Deputy Okun ("Okun"), a Mexican-American, and Deputy McCarty ("McCarty") to Sergeant following the interview process.  RSMF ¶ 54.  Okun had previously worked in multiple Sheriff's Office departments; had served on SERT; had served as an FTO; and had graduated from an additional police training academy.  *Id*. ¶ 55. Okun also gave clear and comprehensive responses to the interview scenario questions.  *Id*. ¶ 56.  McCarty had also served as an FTO, and her interview responses demonstrated a broad understanding of Sheriff's Office operations outside of her own unit.  *Id*. ¶ 57.  Again, plaintiff offers that both Okun and McCarty also had potential weak points in their file; Okun's evaluation prior to his promotion criticized his "booking intake" and "time management" skills, and McCarty had only served in a single unit.  RSAMF ¶¶ 19, 22.

On August 7, 2019, Peck fell on the sidewalk outside of the Sheriff's Office headquarters.  RSMF ¶ 136.  Following her fall, she sought to claim benefits under New York General Municipal Law § 207-c ("207-c"), which provides full

salary and wages, as well as medical treatment costs, for law enforcement personnel who fall ill or are injured in the line of duty. *Id*. ¶¶ 136–37.

A Sheriff's Office committee (the "Benefits Committee") exists to review claims for 207-c benefits and make initial determinations on those claims. RSMF ¶ 138. During the relevant period, the Benefits Committee consisted of four members: a "Sheriff's Designee" (who was the Chief Civil Deputy); a member of the Sheriff's Office Human Resources department; an independent consultant not affiliated with the County; and an individual from the County's risk management office. *Id*. ¶ 139. The parties dispute whether the Benefits Committee has a formal chair; defendants claim it does not and that no member directs the votes of other members, and plaintiff claims that DeMari was regarded as the head of the committee and behaved as a "chair." *Id*. ¶ 140.

The Benefits Committee reviews claims for 207-c benefits with the assistance of nurse case managers, who present employees' cases to the committee for review and translate the medical information into layman's terms. RSMF ¶ 141. In conducting their review of an applicant's 207-c benefits, the committee and nurse managers rely on information such as employee injury reports, supervisors' reports, witness affidavits, any available surveillance video, medical documentation from treating physicians, and the results of independent medical examinations ("IMEs").

*Id.* ¶ 142.  IMEs are conducted by third-party medical personnel to examine an employee's medical status and/or determine the cause of an injury. *Id.* ¶ 143.  Based on the Benefits Committee's review of the available information and the nurse case managers' presentation of cases, it then votes to either approve 207-c benefits, deny them, or leave the matter pending in the event it needs additional information.  *Id.* ¶ 146.

On January 15, 2020, the Benefits Committee voted 4–0 to approve 207-c benefits for Peck.  RSMF ¶ 151.  The following month, however, the Benefits Committee voted 4–0 to deny 207-c benefits to plaintiff.  *Id.* ¶ 152.  The Benefits Committee stated that this denial was based on the results of an IME determining that plaintiff had reached maximum medical improvement ("MMI") and because plaintiff had already returned full-time to work, where she could do her job without restrictions.  *Id.*  At the time of his report, however, Dr. Carr did not find that plaintiff had reached MMI—only that she "should" reach MMI within 6 weeks.  *Id.*

Peck made a second claim for 207-c benefits in late September 2020, when she claimed a chiropractor visit aggravated an existing work injury. RSMF ¶ 154.  The Benefits Committee reviewed her claim and denied it on February 17, 2021.  *Id.* ¶ 155.  The Benefits Committee denied plaintiff's claim on a variety of grounds, most notably because it was untimely.  *Id.*

Defendants highlight that in addition to denying plaintiff's benefit claims, DeMari also voted to deny white applicants' claims. *Id*. ¶ 153.

Peck appealed both the February 2020 and February 2021 denials of her 207-c benefits. RSMF ¶ 157. The appeals were consolidated for hearing before a Hearing Officer, who rendered a decision on February 5, 2023. *Id*. The hearing included over fifty exhibits, as well as witness testimony. *Id*. ¶ 158. Following a four-day hearing, the Hearing Officer affirmed the denial of plaintiff's benefits in both cases. *Id*. ¶¶ 157, 159–60.

On June 11, 2020, Peck complained to Jonathan and Trask about her perceived disparate treatment compared to other members of her unit. RSAMF ¶ 71. According to plaintiff, Jonathan responded to this complaint by stating "I'm not accepting that" and Trask responded by saying "We're not going to have any of your poor me nonsense." *Id*. Defendants deny that they reacted this way. *Id*. Plaintiff further claims that Jonathan and Trask's "retaliatory reaction[s]" continued throughout the remainder of her employment. *Id*. ¶¶ 71, 73. In support, plaintiff cites the deposition of Pellizzari, who stated that an investigation involving plaintiff and a subsequent supervisor's memorandum followed plaintiff's discrimination complaint to Trask and Jonathan. Dkt. 83 at 26 (citing Dkt. 83-13 at 49:12–50:4 ("Pellizzari Dep.")). Defendants, for their part, claim that plaintiff's complaint against Jonathan and Trask resulted in a discrimination-

investigation report, not an Internal Affairs investigation.  *See* Dkt. No. 88-6 ("Pellizzari Aff.") ¶ 3.

On June 15, 2020, Peck's union representative Kevin Moore ("Moore") asked Trask and Jonathan to participate in a "mediation" session with plaintiff.  RSMF ¶ 192.  The session was held the next day.  *Id*. ¶ 193.  During the session, plaintiff raised several grievances.[3]

The same month, given the recent social unrest surrounding the death of George Floyd, Peck received approval from Conway to organize a community relations forum on racial healing.  RSMF ¶¶ 187–88.  The forum took place on June 18, 2020 at Onondaga Community College.  *Id*.  The parties dispute what occurred at the forum; defendants claim plaintiff did not discuss her internal complaints of racial harassment and discrimination with Conway at the forum, and plaintiff claims she cried and told Conway her fears associated with complaining to Trask and Jonathan.  *Id*. ¶ 190.  Although Monica Williams ("Williams"), the Chief Diversity Officer for the County's Office of Diversity and Inclusion attended the forum, plaintiff did not speak to her about her internal complaints.  *Id*. ¶ 191.

---

[3] Plaintiff's grievances included: her coworkers' use of brown-skinned emojis in text messages; the fact that her co-workers had seen video footage of her August 7, 2019 fall on the sidewalk; her perception that she had not been treated with sympathy upon returning to work after her mother's death; an assignment given to her and Poland to go pick up masks and deliver them to a loading dock, which plaintiff believed was not a CRU task; her perception that Trask had been "argumentative" with her by asking her to check in with Jonathan; and the allegation that Kelly had made fun of the similarities between plaintiff and black actress Octavia Spencer.  RSMF ¶ 195.

Later on June 18, 2020, DeMari attempted to visit Peck at work to check on her wellbeing. RSMF ¶ 256. When she was unable to find plaintiff, she contacted Jonathan to confirm that plaintiff's duty hours ended at 4:00 pm. *Id*. ¶ 256. DeMari knew that plaintiff had not received authorization to leave work early, so she asked an administrative assistant working in Human Resources to conduct a limited audit of plaintiff's most recent "punches" in and out of work. *Id*. ¶ 257. The audit revealed that plaintiff had been "punched out" of work by a coworker at 4:00 pm, but that she personally had left the building and drove away in her personal vehicle nearly 40 minutes earlier. *Id*. ¶¶ 258–59. Plaintiff responds to this characterization by noting that the "custom and practice in the office was to leave at approximately 3:30," meaning that she left her job approximately eight minutes early. *Id*. ¶ 259; *see also* RSAMF ¶ 77. The audit also revealed that plaintiff's coworker made three other "out" punches for her in recent weeks with no explanation. RSMF ¶ 260. Lastly the audit found that plaintiff used Tele-Time numerous times, despite DeMari's efforts to curtail its use. *Id*. ¶ 262.

DeMari recognized that the audit potentially suggested misconduct. RSMF ¶ 263. Cassalia had issued a directive to all Chief Deputies instructing that any allegation of wrongdoing rising to the level of potential discipline be reported to Internal Affairs for investigation. *Id*. ¶ 264. Consequently, DeMari believed that she was obligation to report her findings

concerning Peck's early departure on June 18, 2020 and her Tele-Time usage to Internal Affairs for investigation. *Id*. ¶ 265.

Peck ultimately did not receive discipline following the Internal Affairs finding. RSMF ¶ 267. Instead, DeMari directed Pellizzari—at the time plaintiff's direct supervisor—to issue her a supervisor's memorandum. *Id*. ¶ 268. Other Sheriff's Office employees, including white employees, have received supervisors' memoranda for leaving work as little as four minutes early. *Id*. ¶ 274. Similarly, other Sheriff's Office employees, including white employees, have been investigated by Internal Affairs and have been the subject of Internal Affairs reports for misusing Tele-Time. *Id*. ¶ 275.

On June 22, 2020, Peck contacted Williams, who explained the types of complaints her office investigated and directed plaintiff to meet with Curry-Clarry. RSMF ¶ 205. The same day, plaintiff visited Curry-Clarry and delivered her completed complaint form. *Id*. ¶¶ 207–08. Curry-Clarry informed plaintiff that she was assigning an investigator for her complaint and reassured her that the matter would be fully investigated. *Id*. ¶ 209. Curry-Clarry also briefly explained the investigative process to plaintiff, and ultimately assigned Vanessa Baker ("Baker"), a black female Employee Relations Officer, to investigate her complaint. *Id*. ¶¶ 210–11. Baker was also paired in her investigation with Jammie Blumer, who worked in Internal Affairs. *Id*. ¶ 215. After Peck's meeting with Curry-Clarry, she emailed

Williams to inform her that Curry-Clarry had been "very kind" and updated Williams that she had been placed on administrative leave, which she did not object to. *Id*. ¶¶ 206–07.

Following her investigation, which entailed, *inter alia*: reviewing Peck's complaint, interviewing her, asking her for documentation, interviewing the named respondents (Jonathan, Trask, and Kelly) and others from the department, and reviewing complaint-related materials, Baker concluded that plaintiff's complaint was unfounded as a violation of the County's anti-discrimination and anti-harassment policies. RSMF ¶¶ 218–223. Baker further opined that the relationship between plaintiff and respondents, although strained at times, was generally very friendly and that respondents did not exhibit racial animus. *Id*. ¶ 224.

After Baker's investigation concluded, she and Curry-Clarry met with Peck and her husband at the County Personnel Office to review its findings. RSMF ¶ 230. Plaintiff disagreed with the investigation's conclusions. *Id*. ¶ 231. During this meeting, Clarry offered plaintiff the options of returning to work in the CRU under a new supervisor, or to return to her main mission at the Justice Center; plaintiff chose the former option. *Id*. ¶¶ 235–36.

Peck filed an administrative charge of discrimination in July 2020. RSMF ¶ 314. On May 13, 2021, plaintiff filed the instant lawsuit in Supreme

Court, Onondaga County, which was ultimately removed to this Court. *Id.* ¶ 315.

### III. <u>LEGAL STANDARD</u>

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

### IV. <u>DISCUSSION</u>

In their motion for summary judgment, defendants seek to dismiss each of Peck's remaining causes of action.  As a preliminary matter, however, the

Court notes that for most sections of her opposition brief, plaintiff fails to cite to the record (or anything whatsoever) when making factual assertions.  This more often than not leaves the Court guessing at whether there are genuine disputes of material fact.  Failure to provide any meaningful citation to a voluminous summary judgment record is unacceptable, and, for several of plaintiff's claims, forms the basis of summary judgment against her.  *See Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 25 (2d Cir. 2017) (granting summary judgment against plaintiff on discrimination claim where she did not support allegations with evidence because "[r]eliance on conclusory statements or mere allegations is not sufficient to defeat summary judgment"); *Guzman v. Crothall Healthcare Inc.*, 2021 WL 5048993, at *9 (E.D.N.Y. Sept. 29, 2021) ("the Court is not obligated to perform an independent review of the record to find proof of a factual dispute") (citing *Plahutnik v. Daikin Am., Inc.*, 912 F. Supp. 2d 96, 101 n.10 (S.D.N.Y. 2012)). To the extent that otherwise meritorious claims fail in the absence of appropriate factual support, plaintiff has only her counsel to blame.  The Court will now do its best to address each claim in turn.[4]

---

[4] Adjudicating this matter is further complicated by plaintiff's tendency at times to include multiple employment discrimination theories within a single cause of action.  Such "shotgun" style pleading is difficult to follow, inappropriate, and often leads to dismissal.  Plaintiff is cautioned against using these pleading practices in the future.

## A. Discrimination Claims

Claims of employment discrimination are analyzed on summary judgment under the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5]  Under this standard, at the first stage, the plaintiff bears the burden of establishing a *prima facie* case. *Bucalo v. Shelter Island UFSD*, 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted).  The elements of a *prima facie* case—which, if satisfied, "create[ ] a presumption that the employer unlawfully discriminated against the employee," may differ slightly from case to case depending on the nature of the discrimination plaintiff alleges.  *Id.*  The burden of proof that an employment discrimination plaintiff must meet to defeat a summary judgment motion at the *prima facie* stage is "*de minimis*."  *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203–04 (2d Cir. 1995) (citation omitted).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to provide a legitimate nondiscriminatory reason for the employment decision.  *Ellis v. Century 21 Dept. Stores*, 975 F. Supp. 2d 244, 266 (E.D.N.Y. 2013) (citations omitted).  This burden "is not a particularly

---

[5] Courts generally employ the same standards for employment discrimination claims under Title VII, Section 1983, and the NYSHRL.  *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) (Title VII and NYSHRL); *Chick v. Cnty. of Suffolk,* 546 F. App'x 58, 59 (2d Cir. 2013) (Title VII and Section 1983).

steep hurdle." *Id.* (citation omitted).  It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Id.* (citation omitted).

Finally, if the employer makes such a showing, the presumption of discrimination is rebutted and the burden shifts back to the plaintiff. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  Generally, for the case to continue at this stage, the "plaintiff must come forward" with "not simply 'some evidence,' but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action.'" *Balk v. New York Inst. of Tech.*, 683 F. App'x 89, 93 (2d Cir. 2017) (summary order) (quoting *Weinstock*, 224 F.3d at 42).  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough ... to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." *Weinstock*, 224 F.3d at 42 (cleaned up).

1. Failure to Promote

Peck's first species of claims assert that defendants discriminated against her by passing her over for promotion to Sergeant in favor of less-qualified employees outside of her protected class.  Defendants attack these claims on

two grounds: (i) plaintiff fails to establish a *prima facie* case; and (ii) even if she could, there is no evidence of pretext.

In the failure-to-promote context, courts require a plaintiff to establish a *prima facie* case by showing that: (1) she is a member of a protected class; (2) she applied and was qualified for a position for which the employer was seeking applicants; (3) she was not selected for the position; and (4) that the failure to promote occurred under circumstances giving rise to an inference of discriminatory intent. *Ellis*, 975 F. Supp. 2d at 266 (citing *Yu v. New York City Hous. Dev. Corp.*, 494 F. App'x 122, 124–25 (2d Cir. 2012)).

Peck has made the requisite *de minimis* showing for a *prima facie* case. As a black woman, she is a member of a protected class, there is no dispute that she was eligible for the promotions that she sought, and she was not promoted during either of the two promotional rounds at issue in this matter. Finally, the Sergeant positions plaintiff sought were filled by individuals outside of her protected class.

Similarly, however, defendants have cleared the somewhat easy burden of production by providing a legitimate nondiscriminatory reason for their decisions to promote others instead of Peck. Defendants have shown that the candidates they promoted over plaintiff in 2017 and 2019 advanced because they had—and demonstrated through responses to job knowledge-based

interview questions—a broader understanding of Custody Department operations.

The question, then, becomes whether Peck comes forward with sufficient evidence to support a rational finding that defendants' legitimate, non-discriminatory reasons for promoting others are false, and that more likely than not discrimination was the real reason for their actions.  Where, as here, "a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer," that discrepancy itself must "allow[ ] a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination." *Martinez v. City of Stamford*, 2023 WL 3162131, at *1 (2d Cir. May 1, 2023) (summary order) (citing *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001)).  In such cases, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Id*.

Upon review, and drawing all inferences in Peck's favor, she fails to present sufficient evidence from which a reasonable finder of fact could conclude that defendants discriminated against her illegally.  In opposing defendants' motion, plaintiff cites broadly to the "interviews and credentials"

of the officers promoted over her.  *See* RSAMF ¶¶ 12–23, 28.  But plaintiff's isolated observations of arguable weak points in her competitors' evaluations—such as notes that they were "new" to certain units, or that a competitor needed "more confidence"—fail to invalidate the value of those competitors' experiences and board interview performances.  Likewise, plaintiff's citation to her competitors' qualifications does nothing to show how her own qualifications were "so superior" that "no reasonable person, in the exercise of impartial judgment, could have chosen" those competitors for promotion over her.  *See Martinez*, 2023 WL 3162131, at *2.

Peck's other arguments fare no better.  First, plaintiff's assertion that defendants have failed to produce performance evaluations is simply belied by the record; defendants not only produced these documents, but also discussed them in detail with plaintiff at her deposition.  *See* RSAMF ¶ 24. Second, plaintiff's claim that defendants permitted the 2018 Civil Service list to expire in order to promote white employees is a stretch—although the record shows the list expired, plaintiff does nothing to establish that any of the Individual Defendants had the ability or authority to "permit" the list to expire, let alone for that stated motivation.  *See id*. ¶ 27.  Similarly elastic is plaintiff's purported evidence that defendants promoted white officers with "criminal histories" over her—the record reflects that a single deputy was promoted after a criminal *charge*, with nothing in the record referencing the

charge's ultimate disposition. *See id.* ¶ 30. Lastly, although she does not directly highlight it in her opposition to defendants' motion, plaintiff's passing references to her seniority *vis a vis* other candidates ignores the undisputed record evidence that this factor receives little weight in the Sheriff's Office board interview and evaluation process. *See* RSMF ¶ 48. Even if this credential carried more weight, however, plaintiff again fails to show how her seniority was so superior to that of her competitors such that no reasonable person could have selected those candidates over her.

In sum, Peck has failed to present sufficient evidence to support a rational finding that defendants' stated reasons for promoting others over her were false, and that discrimination was more likely than not the real reason for their failure to promote her. Thus, defendants' summary judgment motion on plaintiff's race discrimination claims based on a failure to promote theory will be granted.

## 2. Other Disparate Treatment

Peck also notes several other actions which she alleges constitute race discrimination: (i) the treatment and denial of her 207-c benefits; and (ii) an apparent catch-all category of "other adverse acts."[6]

---

[6] As noted *supra*, these acts include: denying her assignments, taking away her use of a marked police vehicle, subjecting her to mockery, threatening her with transfer or termination, dismissing her complaints, retaliating against her for complaints of discrimination, and making insensitive comments to her about the death of George Floyd.

To establish a *prima facie* case of intentional discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (citation omitted). A plaintiff sustains an adverse employment action if she endures a materially adverse change in the terms and conditions of her employment. *Galabya v. NYC Bd. of Ed.*, 202 F.3d 636, 640 (2d Cir. 2000). To be "materially adverse," the change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citing *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Examples of materially adverse changes include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (citing *Crady*, 993 F.2d at 136).

First, Peck contends that her 207-c benefit denials in February 2020 and February 2021 were discriminatory. Plaintiff's theory appears to be that DeMari and other supervisors discriminated against her by displaying preference for white police officers applying for and receiving 207-c benefits.

For the purposes of analyzing Peck's claim, the Court assumes that she has met the minimal burden of establishing a *prima facie* case. Defendants have also met their burden of producing legitimate nondiscriminatory reasons for denying plaintiff's benefits by providing evidence that: (i) the Benefits Committee made their determinations based on IMEs of plaintiff (which were subsequently upheld by an independent hearing officer after four days of testimony), RSMF ¶¶ 152, 157; (ii) the Benefits Committee had no "head" or "chair," meaning that the votes operated by consensus, rather than simply by DeMari's decree, *id.* ¶ 140; (iii) the month prior to the Benefits Committee's determination that plaintiff had reached MMI, DeMari voted, like the rest of the committee, to approve her benefits, *id.* ¶¶ 151–52; and (iv) that the Benefits Committee imposed IMEs, and denied benefits, to white Sheriff's Office members during the same timeframe that it was considering plaintiff's benefits, *id.* ¶ 153.

Peck's claim with respect to defendants' denial of her 207-c benefits fails at the pretext prong. To support her position, plaintiff attempts to marshal evidence that defendants' reasons for denying her benefits were false and that their denial of her benefits was discriminatory by contrasting certain 207-c benefit approvals for white applicants with the outcomes for black applicants. *See* RSAMF ¶¶ 40–55. But, as defendants note, the record evidence is clear that DeMari voted to deny benefits to similar white 207-c

benefit claimants.  RSMF ¶ 153.  And plaintiff's claim that "Defendants' (sic) raised claims of fraud, deceit, and malingering to the 207c committee, workers' comp board, and her co-workers," does nothing to tie defendants' employment actions to any discriminatory animus.

Lastly, Peck suggests that Reynolds, a former Sheriff's Office clerk, overheard Benefits Committee members express preference for medical evaluations to be done by Dr. Carr because he would reliably find against the employee.  *See* Dkt. No. 83-93 at ¶ 9.  This argument fails to raise an inference of discrimination or otherwise illustrate pretext for several reasons. First, plaintiff does not claim this practice occurred in her own case, just generally.  Second, though plaintiff claims the Benefits Committee expresses a "preference" for particular doctors, the record indicates that the committee members do not choose which doctors perform IMEs, regardless of what their preferences may be.  RSMF ¶ 144; Dkt. No. 88-4 ¶ 6.  Third, even if the Benefits Committee did select which doctors perform IMEs, nothing in Reynolds' affidavit links the committee's "preferences" for certain doctors to a discriminatory animus, versus a neutral goal of limiting benefit grants to all applicants.  Fourth, and relatedly, plaintiff's argument ignores that white Sheriff's Office members also received IMEs from Dr. Carr.  RSAMF at ¶ 46.

Thus, Peck has failed to present sufficient evidence supporting a rational finding that defendants' legitimate reasons for denying her 207-c benefits

were more likely than not based on discrimination, and defendants' motion for summary judgment on claims related to these benefit decisions will be granted.

Second, Peck notes a laundry list of grievances, *see* n.5 *supra*, as evidence of racial discrimination in her workplace.  Even assuming each—or any—of these events could qualify as an adverse employment action, plaintiff does not identify any portions of the record which would support the third and fourth elements of a *prima facie* case.  Indeed, for this category of claims, plaintiff's sole attempt to establish her case consists of a single conclusory sentence stating that her "treatment is replete with examples of discriminatory and disparate treatment as well as retaliation," and a passing "*see generally*" citation to not only the entirety of her own affirmation, Dkt. No. 83-91, but also her entire statement of additional material facts, Dkt. No. 83-2, and defendants' entire statement of material facts, Dkt. No. 75-1. While a plaintiff's burden at the *prima facie* stage is minimal, and the Court must resolve any ambiguities and draw all inferences in favor of the nonmoving party, a conclusory statement followed by a broad general citation to 488 paragraphs is insufficient to establish the elements of a discrimination claim.  *See Forte*, 675 F. App'x at 25 (granting summary judgment against plaintiff on discrimination claim where she did not support allegations with evidence because "[r]eliance on conclusory statements or mere allegations is

not sufficient to defeat summary judgment"); *Guzman*, 2021 WL 5048993, at *9 ("failure to provide any meaningful citation to a voluminous record for such critical facts is unacceptable").

Accordingly, because Peck fails to make even a *prima facie* case regarding her grievances contained in footnote five, defendants' motion for summary judgment on these "other adverse act" claims will also be granted.

**B. Hostile Work Environment Claims**

Defendants next move for summary judgment on Peck's Title VII, NYSHRL, and Section 1983 hostile work environment claims.  In defendants' view, dismissal of these claims is appropriate because: (i) the incidents that Peck describes were not "because of" her race, or were not sufficiently severe to alter her work environment; and (ii) these incidents may not be imputed to the employer.

To survive a motion for summary judgment, a plaintiff claiming she was the victim of an unlawful hostile work environment must elicit evidence from which a reasonable trier of fact could conclude: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  *Mack v. Otis Elevator Co.*, 326 F.3d

116, 122 (2d Cir. 2003), *abrogated on other grounds by Vance v. Ball State Univ.*, 570 U.S. 421 (2013).[7]

To establish the first element of a hostile work environment claim, a plaintiff must produce enough evidence to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera*, 743 F.3d at 20 (citation omitted).  In considering whether a plaintiff has met this burden, courts should "examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Id.* (citation omitted).  Moreover, the "test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* (citation omitted).  It is well-recognized that, "mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's ... protected characteristic,"

---

[7] The same standards govern hostile work environment claims under Title VII, the NYSHRL, and Section 1983. *Williams v. New York City Hous. Auth.*, 61 F.4th 55, 68 (2d Cir. 2023); *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014).

such as race or national origin. *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

Generally, isolated remarks or occasional episodes of harassment do not constitute a hostile environment. *See Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999). While a plaintiff need not present a list of specific acts, she must "still prove that the incidents were 'sufficiently continuous and concerted' to be considered pervasive" or that "a single episode is 'severe enough' to establish a hostile working environment." *Id.* (citations omitted); *see also Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010) (stating that plaintiff can establish a hostile work environment through evidence of a single incident of harassment that is "extraordinarily severe"). Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law. *Patterson*, 375 F.3d at 227.

Defendants first argue that the incidents Peck alleges are racial harassment do "not have inherent racial character," and, even if they do, they are not severe or pervasive enough to survive as a hostile work environment claim.

Unfortunately for Peck, her claim fails before the Court can even consider whether these incidents were racially charged, severe, or pervasive; plaintiff has failed to marshal any record evidence whatsoever, let alone sufficient evidence from which a reasonable factfinder could conclude that her workplace was permeated with discriminatory intimidation. Indeed, while defendants identify a few isolated incidents in their moving brief that they submit *do not* establish a hostile work environment, plaintiff opposes by merely offering conclusory descriptions of workplace incidents with no record citations.

It is well-settled that reliance on conclusory statements or mere allegations is insufficient to defeat summary judgment. *See Forte*, 675 F. App'x at 25; *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). Accordingly, defendants' motion for summary judgment on Peck's hostile work environment claims will be granted.

### C. Title VII and NYSHRL Retaliation Claims

As they do for her discrimination claims, defendants argue that Peck cannot establish a *prima facie* case for retaliation and, even if she could, she cannot establish pretext.

Like discrimination claims, retaliation claims are evaluated under the *McDonnell Douglas* three-step burden-shifting analysis. *Hicks v. Baines*, 593

F.3d 159, 164 (2d Cir. 2010).  To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and that adverse action.  *Id.* (citation omitted).[8]

The plaintiff's burden to make out a *prima facie* case is *de minimis*, and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Hicks*, 593 F.3d at 164 (citation omitted).  If the plaintiff sustains this initial burden, "a presumption of retaliation arises" and the defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.* (citations omitted).  If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action."  *Id.* (citation omitted).  A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were

---

[8]  Courts employ the same standards for retaliation claims under Title VII and the NYSHRL. *See Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 509 n.12 (S.D.N.Y. 2010) (citing *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312–13 (2004)).

objectively valid grounds for the [adverse employment action]." *Id*. at 164–65 (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

Defendants first argue that Peck cannot make out a *prima facie* retaliation case. Specifically, defendants attack plaintiff's claim at the fourth and final element—a causal connection between plaintiff's protected activities and an adverse employment action.

In opposition, Peck again largely fails to cite to the record, though she does offer a few statements from defendant Pellizzari's deposition. Out of these statements, one in particular seems to implicate the fourth element of a *prima facie* discrimination case: Pellizzari explained that an investigation involving plaintiff and the subsequent supervisor's memorandum were a result of plaintiff's discrimination complaint to Trask and Jonathan. *See* Pellizzari Dep. at 49:12–50:4. Defendants, for their part, claim that Pellizzari was referring to an investigation into plaintiff's discrimination complaint rather than an Internal Affairs investigation against her. Pellizzari Aff. ¶ 3. Ultimately, which investigation Pellizzari was referring to in her deposition is unclear. Drawing all inferences in plaintiff's favor, however, her proffered admissible evidence would be sufficient to permit a rational finder of fact to conclude that defendants initiated an Internal Affairs investigation because of her discrimination complaint. Plaintiff has

thus met her *de minimis* burden of establishing the fourth element of a *prima facie* retaliation case.

Defendants argue that any adverse employment action Peck complains of is backed by a legitimate, non-retaliatory rationale that plaintiff cannot undermine with record evidence.  Specifically, defendants note that the June 2020 Internal Affairs investigation occurred because DeMari discovered evidence that plaintiff may have left work early without authorization, and because the Undersheriff's stated "policy" was that all wrongdoing that "rises to the level of possible discipline" be referred to Internal Affairs. RSMF ¶¶ 263–65; 277.  This is sufficient to rebut the presumption of retaliation.

Next, Peck must show that retaliation was a substantial reason for the internal investigation and subsequent supervisor's memorandum.  As noted, Pellizzari stated at her deposition that there was an investigation into plaintiff and a subsequent supervisor's memorandum, which plaintiff argues were retaliation for her discrimination complaint.  *See* Pellizzari Dep. at 49:12–50:4.  Pellizzari further noted that she was not aware of any other individuals during her career who had been investigated and given a memorandum for leaving work eight minutes early.  *Id*. at 50:5–9.

In response, defendants claim that Pellizzari was referring to an investigation into discrimination rather than an Internal Affairs

investigation into Peck.  Pellizzari Aff. ¶ 3.  Defendants also emphasize that the Internal Affairs investigation occurred because of the June 11, 2020 email from the Undersheriff which directed that all cases involving wrongdoing that "rises to the level of possible discipline" be sent to Internal Affairs for investigation.  RSMF ¶¶ 263–65; 277.  Defendants note that Pellizzari was not one of the recipients of this email.  Dkt. No. 75-6 at 82.

Drawing all inferences in Peck's favor, there is a genuine dispute of material fact as to whether the investigation and Pellizzari's subsequent issuance of a supervisor's memo were motivated in part by retaliatory animus.  Although the record indicates that there was an email directing cases involving potential discipline to internal affairs, it is unclear whether an instance of leaving work eight minutes early would rise to the level of "potential discipline."  Moreover, even if Pellizzari was not on the Undersheriff's email directing these cases to Internal Affairs, she ultimately was the one who issued a supervisor's memorandum to plaintiff at DeMari's direction, and she directly tied plaintiff's discrimination complaint—which occurred just days earlier—to both an investigation and the memorandum. In sum, a rational trier of fact could infer that a retaliatory motive played a part in these employment actions.

Accordingly, Peck's Title VII and NYSHRL retaliation claims survive defendants' motion for summary judgment.

**D. Section 1983 Retaliation Claims**

Peck's last two claims allege retaliation in violation of Section 1983. Specifically, plaintiff brings a First Amendment retaliation claim and a Fourteenth Amendment Equal Protection Clause retaliation claim. As an initial matter, the latter claim fails because the Equal Protection Clause does not protect against retaliation due to complaints of racial discrimination. *Littlejohn v. City of New York*, 795 F.3d 297, 316 n.14 (2d Cir. 2015) (citing *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996)).

As for the former claim, defendants first argue that it fails because Peck is unable to point to an adverse employment action, establish a causal connection between such an action and a protected activity, or to undermine defendants' legitimate non-retaliatory employment actions. Next, defendants argue that this claim should be dismissed because, to the extent plaintiff engaged in First Amendment activity, she did not speak as a citizen on a matter of public concern, but rather in the context of her job duties or her own personal employment complaint. The Court agrees with defendants' former argument, which plaintiff does not meaningfully oppose, and need not reach the latter.

Where a public employee brings a retaliation claim based on the First Amendment, a plaintiff must put forth evidence of the following to sustain a *prima facie* case: (i) she engaged in constitutionally protected speech because

35

she spoke as a citizen on a matter of public concern; (ii) she suffered an adverse employment action; and (iii) the speech was a 'motivating factor' in the adverse employment decision. *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 503 (E.D.N.Y. 2011) (citing *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008)).

In what has been a recurring theme throughout this summary judgment practice, the parties have not made it easy for the Court to discern which incident or incidents Peck's First Amendment retaliation claim is based on. For their part, defendants highlight a single occurrence that potentially could qualify as First Amendment retaliation—plaintiff's June 2020 conversation with Jonathan about race and community relations.

As for Peck, she offers nothing. Tellingly, plaintiff does not even address defendants' first argument beyond merely including a catch-all sentence that this claim should survive for the same reasons that her Title VII and NYSHRL retaliation claims survive. But a First Amendment retaliation claim requires a different *prima facie* showing than a retaliation claim under the anti-discrimination laws, and so plaintiff's reasoning with respect to her Title VII and NYSHRL retaliation claims is largely unhelpful. *Compare Hicks*, 593 F.3d at 164 (outlining elements for Title VII retaliation *prima*

*facie* case) *with Skehan*, 465 F.3d at 106 (outlining elements for First Amendment retaliation claim brought by public employee).

Without even an attempt by Peck to make out a *prima facie* First Amendment retaliation case, the Court is left to agree with defendants— plaintiff has failed to point to an adverse action, establish a causal connection between an action and a protected activity, or to undermine the legitimacy of defendants' employment actions. Accordingly, her Section 1983 First Amendment retaliation claim will be dismissed.

## V. __CONCLUSION__

Therefore, it is

ORDERED that

1. Defendant's motion for summary judgment is GRANTED in part and DENIED in part;

   a. Plaintiff's Title VII, NYSHRL, and Section 1983 claims for discrimination (Counts I–IV) and Section 1983 Retaliation claims (Counts VIII and IX) are DISMISSED;

   b. Plaintiff's Title VII and NYSHRL retaliation claims (Counts V–VII) remain for trial;

2. Trial on plaintiff's remaining claims is set for January 23, 2024.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  September 6, 2023
    Utica, New York.